**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

v.

**JUAN MARTINEZ, Defendant**

Criminal No. 1984/26

District Court of the Virgin Islands
Div. of St. Croix
September 11, 1986

ANDREW J. REICH, ESQ., Assistant United States Attorney (Office of the U.S. Attorney), St. Croix, V.I., *for government*

MICHAEL JOSEPH, ESQ., St. Croix, V.I., *for defendant*

O'BRIEN, *Judge*

## MEMORANDUM OPINION

This case presents a novel question under the rule of Brady v. Maryland: does a defendant who deliberately concealed from his lawyer a confession that he gave to the police vitiate an otherwise valid Brady claim. Under the circumstances of this case, our answer is yes.

## I. FACTS

The underlying facts were extensively detailed by the Third Circuit and do not warrant repeating here.[1] Briefly, however, defendant Juan Martinez was convicted of first degree murder by a jury after unsuccessfully staging an alibi defense. During his sentencing proceeding, Martinez revealed that he had confessed to a police officer four days before the trial, maintaining however, that he had acted in self defense. That officer, Oscar Vigo, later stated in an affidavit that he reported the confession to both the

---

[1] See Government of the Virgin Islands v. Martinez, 780 F.2d 302 (3d Cir. 1985).

prosecutor, Frederick Jones, and detective, Steve Brown, assigned to the case. Jones subsequently denied knowledge of this confession.

Martinez' statement was not disclosed to defense counsel despite a discovery request for "all oral confessions or statements, subsequently reduced to writing, summarized in police reports, made by the defendant" and he never told his lawyer about the confession. After receiving a life sentence, without parole, Martinez moved for a new trial, arguing that the nondisclosure violated his right to a fair trial under Brady v. Maryland, and our denial of this motion was appealed.

The Third Circuit found that the Brady claim could not be decided until several factual issues were resolved. Government of the Virgin Islands v. Martinez, 780 F.2d 302 (3d Cir. 1985). The case was remanded and, on June 18, 1986, an evidentiary hearing was held. The testimony provided answers to all of the Third Circuit's questions. We address the questions and the salient testimony seriatim.

A. *Was Martinez' confession reduced to writing by Officer Vigo, either contemporaneously or in any subsequent reports or memorandum? Was it reduced to a writing in any form by any of the prosecution's agents?*

The answer to both questions, according to the sworn testimony of the prosecution team, is no.

On direct examination, Vigo testified as follows:

Q Did you ever write down in any kind of statement, report, or any kind of writing whatsoever, did you write down what Mr. Martinez told you?

A No, I never wrote anything down.

Q Did you ever make any written memorandum at all of what Mr. Martinez told you?

A No, I never wrote anything down.

Q Did you ever make any written memorandum at all of what Mr. Martinez told you?

A No, I didn't.

(Tr. 12.)

Vigo reiterated this testimony on cross examination:

Q And, when Mr. Martinez gave you that statement, did you write that down?

A I didn't have—I didn't write it down. I didn't have nothing to write it on. So, my response to Mr. Martinez was that I will talk to my partner, Officer—Detective Brown. And, I will see that he—they both get together and he can give his statement to Mr. Brown. But, the statement could be taken down and he could sign for it.

(Tr. 18.)

Detective Brown testified as follows:

Q . . . . Now, after that information was conveyed to you, did you put down in writing what Vigo told you?

A No, sir.

Q Did you ever make any written memorandum of any nature concerning what that confession was about?

A No, sir, I did not.

Q At any time, did you make any written memorandum?

A No, sir.

(Tr. 34-35.)

Jones, the prosecutor, denied any pretrial knowledge of the confession and testified further that he has never seen a written account of Martinez' statement:

Q At any time prior to [the sentencing proceeding], had you ever received any information that the defendant had confessed to the killing?

A No.

Q Had you received any such information from Oscar Vigo?

A No.

Q Had you received any such information from Detective Steve Brown?

A No.

Q Or, from any other officer?

A No.

Q Had you seen any written document of any nature whatsoever which contained either a police report or written confession from the defendant, Juan Martinez?

A No.

(Tr. 66.)

389

On the basis of this undisputed testimony, we find that Martinez' confession was never reduced to writing and thus, was not specifically demanded by the defense.

B. *What is the extent of the information conveyed by Martinez? Did the government obtain other exculpatory evidence that was not disclosed to the defense?*

According to the testimony of Brown and Jones, who officially represented the government, the details of Martinez' confession were never pursued. Vigo, a longtime acquaintance of Martinez, was barred from working on the case. (Tr. 37-38.) Nevertheless, he conducted a brief and fruitless investigation.

He testified as follows:

Q Now, based upon the information that Mr. Martinez told you, based on this confession which he gave to you, did you conduct any additional investigation based on his confession to you?

A No, the only thing I did after I told Brown—we had so many cases. And, he told me that he believe that the deceased's brother had the sawed off shotgun.

Q Who told you this?

A Mr. Martinez.

Q What?

A That the deceased's brother had the sawed off shotgun. So, I went to the deceased's brother and I spoke to him and he said he don't have no notice of the gun.

Q Did Mr. Martinez tell you that he thought the deceased's brother had the shotgun during the same conversation when he made this confession to you?

A That's correct, yes.

Q And you went and spoke to the brother?

A That's correct.

Q And, the brother said he knows nothing about the shotgun?

A That is also correct.

Q Other than that, did you conduct any other investigation based upon what he told you?

A No, I didn't conduct no investigation.

(Tr. 13-14.)

Brown testified that Vigo's account of the confession was essentially ignored:

Q Now, after Officer Vigo gave you that information about the confession, did you conduct any subsequent investigation based on that information that Vigo gave to you?

A No, sir.

\* \* \* \*

THE COURT: Did you direct anyone else to do any investigation?

THE WITNESS: I discussed the case with two other officers who were assigned to the murder with me, Officer Zurita and Officer Calito Rodriquez. They were both assisting me. I discussed the information with them.

Q Did you request either of them to make any investigation based on that confession?

A No, sir.

Q You're saying you don't know or they did not?

A I don't know.

Q Were you the case agent in charge of this case?

A Yes, sir.

Q As the case agent, if there is any investigation, are you the one that would be advised of that investigation?

A Yes, sir, if we received information that we consider authentic information, we will conduct an investigation into it.

THE COURT: Well—excuse me. As the case agent, would it be improbable or probable that having told Zurita and Rodriquez about it that they would do something on their own without any direction from you?

THE WITNESS: That would be improbable, sir.

BY MR. REICH:

Q Did Zurita or Rodriquez ever come back to you and say they ever did additional investigation of what you told them?

A They got back to me, if I remember, within a day or two and they thought the information was erroneous.

391

Q Do you know whether or not they had conducted an investigation based on that information?

A No, sir, I don't know. I think this is just during the discussion or it was tossing it around. And, we all left stating that we'd think about it and later on, they came back to me and said they thought the information was erroneous. And, I did, too, at the time.

THE COURT: What information are you speaking about, Gomez' shotgun?

THE WITNESS: No, the information obtained from Officer Vigo himself.

THE COURT: You thought Vigo was giving you bad information?

THE WITNESS: Yes, sir.[2]

(Tr. 35-37.)

Jones testified to the same effect:

Q And, are you aware of any investigation that was conducted based on the confession that was supposedly given to Oscar Vigo? Are you aware of any investigation that was done based upon that confession?

A At the time I was not aware that anything had been done. The only thing I found out recently is Officer Vigo said he did talk to the brother of the deceased and asked him about a shotgun and was told that he had no shotgun.

Q And, when did you acquire that information?

A Yesterday, I believe.

---

[2] Brown's distrust of Vigo grew out of an earlier incident in this case:

THE COURT: Would you elucidate on why you thought a veteran police officer would be giving you poor information?

THE WITNESS: Yes, sir. When we first started the investigation into the murder, we had obtained a search warrant to search the defendant's house. Officer Vigo told us that he was a friend of the family, and that he pointed out the house to us so that we have a proper description of the house to put in the arrest warrant. I was—I was told at the time to more or less to watch myself because Officer Vigo was a friend of the family.

He was, therefore, taken off the case. However, when we did obtain the search warrant, we found out that the house that Mr. Vigo had said was the defendant's house was, in fact, not the defendant's house.

And we were under the assumption that it might have been done intentionally. I mean no disrespect to Officer Vigo.

(Tr. 37-38.)

Q Other than that, are you aware of any other investigation that was conducted based on the alleged statement that Martinez made to Vigo?

A No, I'm not aware of any.

(Tr. 66–67.)

We conclude that the prosecution derived no exculpatory evidence from the confession.

C. *What was the extent of the prosecutor's knowledge of the confession?*

It is undisputed that Brown first told Jones about the confession after Martinez was sentenced. Vigo testified:

Q Now, after Mr. Martinez—and, you said this was four days before the trial that he gave this information to you?

A Yes. That's correct. Four days prior to the trial.

Q Did you ever convey this information to anybody else?

A I told Detective Brown—at the time that was my partner, who was in charge of investigation, that Mr. Martinez has confessed to me about the incident and he would like to talk with him because he want to enter a plea bargain.

Q Okay. Did you tell Detective Brown the details of what Mr. Martinez told you?

A The following morning I told Mr. Brown about the confession that Mr. Martinez had made to me.

Q Did you tell him the details that Mr. Martinez told you?

A Every detail.

Q Did you ever tell anyone else about Mr. Martinez' confession?

A No, just Mr.—Detective Brown.

Q Did you ever tell—are you familiar with Fred Jones, the prosecutor who handled that case?

A Yes.

Q Did you ever tell Fred Jones about that confession?

A No, I never told Mr. Jones about it.

(Tr. 11–12.)

Brown testified:

Q Did you ever tell Fred Jones what Officer Vigo told you?

A Yes, I did.

393

Q Did you tell him that before the trial?

A After the trial.

Q Why didn't you tell him before the trial?

A Well, at the time, I felt the information was erroneous. And, I didn't want the officer—I didn't want Officer—Attorney Jones to get pulled off in left field by something that I didn't think was correct or relevant.

THE COURT: Well, let's set the stage now. The jury came in. The jury unanimously found Mr. Martinez guilty of first degree murder. So, we commenced immediately to a sentencing.

THE WITNESS: Yes, sir.

THE COURT: Were you in the courtroom then?

THE WITNESS: No. I think I had left at that point, your Honor.

THE COURT: Well, at that point, then Mr. Martinez took the stand and it was then that he informed everybody about what Vigo said. Had you told Jones about it before that event, that is, the jury having come in or after?

THE WITNESS: After, sir.

THE COURT: How soon after?

THE WITNESS: I think I told him the following day—the following one to two days.

THE COURT: Well, Jones was here for that. Did he raise the subject with you or did you tell him?

THE WITNESS: No, I think I raised the subject, if I remember correctly, sir.

(Tr. 38-40.)

Jones' testimony confirmed these accounts:

Q And, were you present when Juan Martinez took the stand during the sentencing proceeding and admitted to shooting Mr. Gomez?

A Yes.

Q At any time prior to that, had you ever received any information that the defendant had confessed to the killing?

A No.

394

Q Had you received any such information from Oscar Vigo?

A No.

Q Had you received any such information from Detective Steve Brown?

A No.

Q Or from any other officer?

A No.

Q Had you seen any written document of any nature whatsoever which contained either a police report or written confession from the defendant, Juan Martinez?

A No.

Q During the trial, did the defendant testify?

A He did.

Q Do you recall whether he testified in English or Spanish?

A He testified in English to the best of my recollection.

Q Now, after the trial, was any information brought to your attention that, in fact, a statement had been made by the defendant prior to this when he confessed?

A After leaving the courtroom.

Q After leaving the court.

A Yes.

Q And, who told you that?

A I talked to Detective Steve Brown.

Q And, what did Steve Brown tell you?

A Steve Brown told me that yes, he had been informed by Officer Vigo that Mr. Martinez had made a confession to him. And, that when I questioned Mr. Steve Brown, questioned him about why he didn't tell me, he said, why, I just didn't believe him.

I think that was either the day after or a couple of days after the trial. I saw Steve Brown on the street near Christiansted.

(Tr. 65-67.)

D) *Was Martinez incapable, for any reason, of communicating truthfully with his attorney?*

It is significant to note at the onset that Martinez was represented by two public defenders: Martha Fleetwood, who was based in St. Croix, and Mario Conte, a veteran criminal trial attorney brought in from San Diego. Conte's involvement evidences the seriousness with which the Federal Public Defender viewed this case and having presided over the trial, we can attest to the quality of representation that Martinez received.

1) *Although his primary language was Spanish, it is undisputed that Martinez could communicate effectively in English.*

Ms. Fleetwood testified:

THE COURT: Excuse me, one more question. Did you speak to Mr. Martinez in English?

THE WITNESS: I did.

THE COURT: Did he speak to you in English?

THE WITNESS: He did.

THE COURT: So that the family members did not interpose themselves as interpreters at all?

THE WITNESS: No, the family members—a brother, in particular, interposed himself as an interpreter for the father who did not speak English. But, the other family members and Mr. Martinez spoke English.

(Tr. 73.)

Andre Petersen, the public defender's investigator, testified similarly:

Q Did the defendant Juan Martinez speak English?

A Yes.

THE COURT: Expand on that. Did he speak in such a way as you were capable of understanding him and did he understand you when you spoke to him?

THE WITNESS: Yes, I did, sir.

(Tr. 111.)

Jones and Brown also agreed that Martinez could both understand and communicate in English. (Tr. 43, 69.)

396

Most importantly, Martinez himself was comfortable with the English language. At trial, as at this evidentiary hearing, a Spanish interpreter was made available to him but he refused this help. (Tr. 122.)

2) *Martinez understood the role of Ms. Fleetwood, his English-speaking public defender.*

Martinez testified that he trusted his lawyer:

THE COURT: . . . Did you believe in your attorney? Did you trust Ms. Fleetwood, Mr. Conte?

THE WITNESS: Yes, sir.

BY MR. JOSEPH:

Q But, you didn't want to tell them?

A But, I didn't want to tell them.

Q And, why did not you want to tell them?

A Well, I—I repeat it again, I was afraid. I was very afraid, you know. My head was spinning, because this is the first time I do this.

(Tr. 134-35.)

Martinez testified further that, despite Ms. Fleetwood's warnings about the overwhelming strength of the prosecution's case, he decided not to confess to her or tell her about his statement to Vigo because he did not want his family to learn that he had indeed killed Gomez:

Q Now, when you had your conversations—you spoke to your attorney, Ms. Fleetwood, before the trial; isn't that correct?

A Yes, sir.

Q In fact, you spoke to her many times; isn't that right?

A Yes, sir.

Q And, didn't she tell you when you spoke to her, did she tell you about [what] the government witnesses would say at the trial?

A Well, I was—I was very confused because I had my family around and I want to talk to her, but I have my family around. And, I don't want to make my family feel bad about me, you know.

397

Q That wasn't my question. When you spoke to Miss Fleetwood, did she tell you what the government witnesses would say? Did she tell you?

A Oh, yes, yes, sir.

Q And, did she tell you that there were witnesses that would say that you were there—

A Yes, sir.

Q —at the time of the killing?

A Yes, sir.

Q At any time during any of the conversations that you had with Ms. Fleetwood, did you ever talk to her about putting on a defense of self defense [instead] of putting on an alibi— of putting on a self defense?

A I never speak nothing to her.

Q You never spoke to her?

A Yeah, she spoke to me, but I never give no answer for nothing.

. . . .

Q Did you ever tell your attorney, Ms. Fleetwood, that you had made that statement to Vigo? Did you ever tell her that you told Vigo about what you did?

A No, I only say it in court before the sentence.

Q Why didn't you tell her?

A Because I know if I told her, well, maybe my family would know it.

(Tr. 128-29.)

Ms. Fleetwood opined that Martinez' choice to pursue an alibi defense was dictated by his family, and particularly by his father. (Tr. 77-79, 96-97.) This conclusion was shared by Petersen, the investigator. (Tr. 109-110.) Ms. Fleetwood described the attorney-client relationship:

a) *She explained her role as defense counsel and he understood it*

Q When you had that conversation with Mr. Martinez, did he . seem to understand what you were telling him?

398

A Yes, Mr. Martinez, when he didn't understand anything would tell me he didn't understand. And, frequently, if he did not respond in a way that I was sure he was understanding, I would ask him, "Do you understand?" I would go over with him again and he would say, "I understand, I understand, I understand, Miss Fleetwood." I mean, I remember that.

Q And, were you satisfied that he understood you were acting in the role of a defense attorney? In other words, that you were there to protect his interests?

A Definitely.

Q At any point, did you ever get the impression from Mr. Martinez that Mr. Martinez somehow felt as though you were a person who, in your capacity, could find him guilty?

A Not at all, no, unh-unh.

(Tr. 75-76.)

b) *Ms. Fleetwood repeatedly warned Martinez about the strength of the prosecution's case*

THE COURT: Did you ever confront Mr. Martinez and say this person said you did it, and this person said you did it. This person said they saw you deliver two final shots to the body. Did you ever confront him with that?

THE WITNESS: Repeatedly. Mr. Martinez accompanied the investigator and I on several of our trips to Sofarelli Project to interview several witnesses.

THE COURT: What was his reaction to the repeated information of the contradictory information?

THE WITNESS: When pressed very, very hard, he would, in exasperation, say, "Oh, they lie."

But several times in our communications with him, I felt that he understood that he had, in fact, committed this homicide. But, that he was unwilling to openly admit that and to even verbally admit that. He certainly never said that to me.

399

BY MR. REICH:

Q So, despite the fact that you had repeatedly confronted him with the fact that witnesses said he was there, he still maintained that he wanted to go ahead with an alibi defense at trial? Despite your confrontation with him about all this, he still was agreeable to an alibi defense; is that correct?

A In essence, but I wouldn't say that he was agreeable to it. What would happen is that we would have these confrontations with either witnesses or with the investigator. And, I would read to him witness statements or [tell] him the number of witnesses who had certain testimony they would present against him. And, he would become very distressed and distraught and agitated. And, when we would say, you know, whatever we had to say about what we felt he had done, he would sort of assent to our interpretation and what we thought had occurred.

But, he would never verbally make any statements that is, in fact, what occurred and generally he would say, "I got to go now. I got to get out of here." And, he would be pacing the room and he would leave and go talk to his family. He would say, "I got to talk to my family." And then, he would say, "No, I didn't do it. I didn't. I'm not going to say that I did it."

Q Ultimately an alibi defense?

A Ultimately an alibi defense.

Q Even in light of this information he knew about before the trial?

A Correct.

(Tr. 86-88);

c) *She believed that Martinez respected her advice but rejected it at his family's urging*

THE COURT: In the course of your representation of Mr. Martinez, as you reflect on it and in comparison or in relation to your representation of other defendants charged with crimes, did you have a feeling that you had developed as much as, less, or equal rapport with him?

THE WITNESS: Equal or greater to many clients. I really spent a lot of time with Mr. Martinez compared to other cases and a lot of time

400

> trying to talk to him as a human being, a person to person conversation, rather than attorney-client, to get him to understand the position he was in and why he should assert himself more independently from his family. But, he wasn't able to.

THE COURT: Did you yourself ever have the feeling that you had gained his confidence or did you have the feeling that you had not gained his confidence?

THE WITNESS: I felt that I had gained his confidence in terms of him listening to whatever I had to say and respecting it. But, I really felt that he was behind some wall, and the wall was his family. And, that neither I nor anybody else was going to be able to walk over the wall. It was—it was something that was holding him back from standing on his own two feet and making a decision. And, I felt that it was him as a person as opposed to anything else.

(Tr. 79-80);

d) *Finally, in response to the Third Circuit's inquiries as to whether Martinez viewed her as an adversary rather than an advocate, Ms. Fleetwood testified*

THE COURT: Ms. Fleetwood, have you read the Third Circuit's decision in this case?

THE WITNESS: I have, Your Honor.

THE COURT: Page 13. The Third Circuit has sent this back for us to conduct a hearing and to resolve certain questions. Some of those questions involve your role in the case. The first one: the Third Circuit said we should consider whether Martinez was incapable for any reason of communicating truthfully with his attorney.

THE WITNESS: I think he was, your Honor, the reason being this family role that kept him from independently making a decision.

401

THE COURT: Was there anything as to you that caused him to be able or to be incapable of communicating truthfully with you?

THE WITNESS: Not that I was ever able to understand from how he interacted with me. Of course, if he wasn't understanding my words, or had some other problem with my appearance or whatever, I don't know. He never communicated those things to me. But, I never felt in my conversations with him that there was any barrier between us other than that he was not using independent decision making.

THE COURT: And you relate that to his family situation?

THE WITNESS: Definitely. I saw it in their actions.

THE COURT: The second item that the Third Circuit has suggested with respect to your involvement is this: it is possible that Martinez may not have understood his English-speaking lawyer's role. This is suggested by his willingness to confess to his Spanish-speaking police officer but not to his own counsel. Do you have any idea of whether or not—I think this has come out, but I would like to speak directly to the point raised by the Third Circuit. Do you have any question in your mind as to his understanding of your role as his lawyer?

THE WITNESS: I don't have any question about it.

THE COURT: And what is the answer then?

THE WITNESS: I think—I don't know that I would call this speculation, but cut me off if it sounds like it. I would think that he felt that in the role Vigo played that Vigo had the power and authority and the connections within the community in which they lived to go and find these weapons. And, I'm certainly sure he never thought that I had that power or authority. And, I felt when I first heard about his statements to Vigo, that he had never gone and admitted to Vigo or anybody

402

in the sense that Mr. Martinez would call a confession, that he had committed this crime.

I felt that what he had done was hoped that Vigo could help him and say, "Hey, you know, you know about this guy. He's been bugging me forever. Last time he pulled a gun. Go find the gun. If you find the gun, I could tell the truth."

But, without that kind of assistance from Vigo, there was nothing that was going to make him able to tell the truth.

(Tr. 89-92.)

D) *Knowledge of the confession would have drastically altered the defense strategy recommended to Martinez.*

Ms. Fleetwood testified that, had she known of Martinez' confession, she would have attempted to convince her client to pursue a drastically different defense. She stated: "We would have probably been able to present a more self defense case and get him off on a much lower charge, if not off completely." (Tr. 97.)

E. *Martinez was not pressured into confessing.*

He confessed to Vigo, an acquaintance of at least seven years, on virtually the eve of trial. He was free on bail at this time and initiated the conversation.

Vigo testified:

THE COURT: How did you happen to come across him, or him across you in Mon Bijou four days before trial?

THE WITNESS: I was—I went to visit my sister, which live in Mon Bijou area. On the way back, I stopped by the grocery store to buy a pack of cigarettes. Then, he was at the grocery store, and he told me he wanted to talk to me, but in private.

I said, okay. As soon as I left the store, I made it down the road about half a block on the street, on the public street. And, I pulled the car over to the side, and I got out and I spoke to him.

(Tr. 12-13.) 403

In summary, Martinez voluntarily admitted his guilt to a friend on the police force in the hope that a lenient plea bargain could be arranged. His recollection of this conversation's details is still perfect. Although he trusted his attorney, he did not tell her about the confession due to fear that his family would learn that he was indeed Gomez' killer. We must now decide whether Martinez' rights under Brady v. Maryland were violated and, if so, what is the effect of his untruthfulness on that claim.

## II. DISCUSSION

### 1) *Did a Brady violation occur?*

██ Brady v. Maryland requires the prosecution to disclose evidence that is both favorable to the accused and "'material either to guilt or punishment,'" United States v. Bagley, 105 S.Ct. 3375, 3379 (1985) quoting Brady, 373 U.S. 83, 87 (1963). The Brady rule is part of the criminal defendant's due process right to a fair trial, United States v. Agurs, 427 U.S. 97, 108 (1976), and the remedy for a violation of it is a new trial. E.g., Bagley, supra.

At the onset, we note that Martinez' confession, assuming· its truth, tended to exculpate him from the first degree murder charge. We proceed to decide whether it was material and should have been disclosed.

### A) *Nondisclosure*

Prosecutor Frederick D. Jones testified that he did not learn of Martinez' confession until after the trial. (Tr. 67.)[3] The statement was never reduced to writing and, therefore, was not subject to the specific demands of Martinez' discovery request. It yielded no further exculpatory evidence because it was not investigated.[4] The Third Circuit suggested, however, that Brown's knowledge of the confession may be imputed to Jones. Martinez, supra at 308 and n.8.

---

[3] Jones' account was confirmed by Detective Brown and Officer Vigo. Vigo testified that he told only Brown of Martinez' confession. (Tr. 11-12.) Brown, in turn, stated that he waited until after the trial to relay this information to Jones because he doubted Vigo's veracity. (Tr. 38-40.) These statements are seemingly in conflict with the affidavit of Andre Petersen, the public defender's investigator. Petersen, however, testified that he did not know whether Brown told Jones about the confession before the trial's end. (Tr. 107.)

[4] Vigo conducted an unauthorized and unsuccessful investigation. (Tr. 13-14.)

■ This proposition finds support in the pronouncements of the Supreme Court: whether nondisclosure resulted from the prosecutor's good or bad faith is irrelevant because a due process violation results from the character of the evidence and not the prosecutor. Brady, supra at 87; Agurs, supra at 110 and n.17.

■ We must, therefore, impute knowledge to the prosecutor under the narrow circumstances of this case.[5] In this district, the prosecutors work closely with their investigators and will be held accountable for information that their colleagues—at least those officially assigned to the case—decline to share. As this case demonstrates, a confession has inherent legal implications that may only be apparent to a lawyer. A constitutional violation occurring in this scenario is no different than, for example, an illegal search. Thus, it is the government, and not the defendant, which must be penalized when a case investigator fails to communicate Brady material to the prosecutor.

■ Finally, the prosecution had a constitutional duty to turn the confession over to the defense because it simultaneously negated first degree murder's element of intent and fatally contradicted Martinez' alibi. In other words, the confession was "obviously of such substantial value to the defense that elementary fairness require[d] it to be disclosed even without a specific request." Agurs, supra at 110.

B) *Materiality*

■■ Undisclosed evidence is material for Brady purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, supra at 3384.

Martha Fleetwood, the lead defense counsel, testified that the confession would have drastically altered her opinion of Martinez' best trial strategy. She would have urged him to pursue a defense of self defense in the hope of winning an acquittal or conviction of a lesser degree of homicide. (Tr. 97.) The success of this tactic obviously would depend on Martinez' credibility. Bagley mandates that he be retried only if it is probable that his account of Gomez' armed arrival at his home would result in any verdict but first

---

[5] Accord United States v. Auten, 632 F.2d 478, 480-81 (5th Cir. 1980); Martinez v. Wainwright, 621 F.2d 184, 186-88 (5th Cir. 1980).

degree murder. We need not decide whether it is likely that a jury would believe Martinez, who has already perjured himself blatantly but unconvincingly before this Court, because the Third Circuit held that the confession was material. Martinez, supra at 306.

■■ Although the confession was material and should have been disclosed, it does not necessarily follow that Martinez' Brady rights were violated. "[S]uppression of evidence amounts to a constitutional error only of it deprives the defendant of a fair trial." Bagley, supra at 3381. The requisite prejudice is clearly lacking, at least in this circuit, where the defense already possesses the undisclosed information. United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984); United States v. Dansker, 565 F.2d 1262, 1265 (3d Cir. 1977), cert. denied, 429 U.S. 1038 (1977).

It cannot be argued that Martinez did not know the details of his confession at all times. He admitted his guilt to Vigo only four days before his trial and repeated it verbatim upon sentencing less than a week later and then again during this proceeding. His lawyer, however, knew nothing of it and this fact distinguishes Starusko in one significant sense: the defense lawyer was privy to the purported Brady material. See Starusko, supra at 262. Informed counsel is an important component of the accused's right to a fair trial on which Brady is based. The recipient of pretrial discovery is, after all, the defendant's lawyer. Our analysis does not end here, however, because we hold that the attorney's knowledge is not a dispositive element of the Starusko rule.

2) *Martinez' Untruthfulness Vitiates the Brady Claim*

The Third Circuit recognized that "[t]he prosecution raises a strong counterargument to Martinez' Brady claim when it contends that in this case the defendant himself knew of the exculpatory evidence. The only reason his counsel was unaware, the government insists, was because Martinez lied." Martinez, supra at 308. The Court declined to formulate a test for analyzing the effect of the defendant's untruthfulness on a Brady claim but stated alternative approaches:

> It could be contended that where evidence is material— defined by the Supreme Court in Bagley as meeting a reasonable probability that the outcome would be changed assuming disclosure by the government—only as a result of the defendant's lying to counsel, the defendant may invoke Brady to win a new trial. Under this view, when making the

406

materiality judgment, the court is limited to considering whether there is a reasonable probability that disclosure would have led to a different outcome even if the defendant had not lied to his attorney. Thus, a Brady violation would occur only where, assuming the defendant had been candid with his attorney, the nondisclosed evidence would still be of significant value to the defendant's case. The counterargument is that the Brady rule has little to do with lying, but instead aims to encourage desired prosecutorial conduct to promote fair trials.

Id. at 309.

We have been cited to several cases in which defendants have won new trials on grounds of newly discovered evidence or Brady v. Maryland despite their lack of candor. The circumstances before us distinguish each of those cases.

The essential facts warrant repeating. Martinez, on his own initiative, confessed to Vigo, a longtime acquaintance. This occurred four days before trial while he was free on bail. Consequently, this is not a case where a confession was blurted in the aftermath of an arrest when there is a likelihood that the accused, consumed by shock and fear, might unwittingly incriminate himself and then forget about it. See Martinez, supra at 309-10. This is even more likely when the confession precedes consultation with a lawyer. This did not occur here. Martinez' confession was coolly calculated and motivated by the hope that Vigo would help to arrange a more lenient plea bargain than the one of second degree murder already offered to his lawyer. (Tr. 8-9.)

Nor can it be argued that his recollection is "hazy or defective." United States v. Lewis, 511 F.2d 798, 802 (D.C. Cir. 1975). To this day Martinez remembers the precise details of his confession and, therefore, it cannot be considered newly discovered evidence. Accord United States v. Ianelli, 528 F.2d 1290, 1292-93 (3d Cir. 1976); United States v. Bujese, 371 F.2d 120, 125 (3d Cir. 1967).[6]

We also reject the suggestion that Martinez' defense might somehow have been prejudiced by his uncertainty as to whether the prosecutor knew of the confession and planned to use it at trial. He pursued the alibi defense and the substance of the confession

---

[6] The accuracy of Martinez' memory is demonstrated by Vigo's testimony which relates the substance of the confession consistently. Both recollections are the same.

was never used against him at trial. This is not a case where the prosecution ambushed a defendant with Brady material. United States v. Maroney, 319 F.2d 622 (3d Cir. 1963) (defendant's statement introduced during punishment phase of capital trial); United States v. Padrone, 406 F.2d 560 (2d Cir. 1969) (defendant impeached with his undisclosed confession). The concern here is that the accused, having planned his defense in reliance on the nondisclosure, would be unprepared at trial to confront contradictory evidence that was not disclosed. See Padrone, supra. Such a situation would certainly exist here if Jones, while cross-examining Martinez on his alibi testimony, had asked: "Isn't it true that you told Detective Vigo that you killed Gomez." This, of course, did not happen because Jones had no actual knowledge of the confession.

Nor is this a case where the defendant was incapable of communicating truthfully with his attorney. Unlike the defendant in Nagell v. United States, 354 F.2d 441 (D.C. Cir. 1966), Martinez' mental capacity has never been questioned. (Tr. 103.) By all accounts, he understands and communicates well in English. (Tr. 43, 69, 73, 111.) He admits that he trusted his lawyers (Tr. 134–35), but refused to admit his guilt to them because his family would have found out that he was Gomez' killer. (Tr. 128-29.) This is why he opted for the alibi defense. (E.g., Tr. 86-88.)[7]

And finally, the record is devoid of any indication that Martinez' relationship with his counsel was anything but exemplary. Ms. Fleetwood, his English-speaking female public defender, testified that he understood her role as his attorney and respected her advice. (Tr. 79-80, 89-92.) Consistent with Martinez' testimony, she opined that it was the oppressive influence of his family that prevented him from being truthful with her. (Tr. 79-80.)

We must now decide whether, in light of these facts and assuming Martinez "had been truthful with his attorney, the nondisclosed evidence would still be of significant value to [his] case." Martinez, supra at 309. We think not.

The subject matter of the Brady claim is precisely the same as the information he deliberately withheld from his lawyer. The defense lawyer had two obvious avenues of discovery—her client, who had actual knowledge, and the prosecutor, whose knowledge

---

[7] Martinez suggests that his father's domineering influence is analogous to the Nagell defendant's mental incapacity. The argument is ludicrous. Nagell could not be truthful. Martinez decided not to be. We refuse to equate organic illness with a son's desire to please his father.

is imputed. It is clear to us that had Martinez told his lawyer of his confession, the prosecution's nondisclosure could have had no impact on his defense because the information sought from the government would have been obtained by the lawyer independently. See Starusko, supra at 262. The bottom line is that the confession was material to Martinez' defense solely because of his own untruthfulness.[8] Under these facts, the established rule in this circuit is that "independent discovery of the [nondisclosed Brady material] . . . negates any argument that the defendant was deprived of rights assured by the Constitution." Id. at 262. See Dansker, supra at 1265.

Starusko's facts would be startlingly similar to the ones we face here if Martinez had been truthful. The Starusko prosecutor failed to turn over impeachment evidence that had been specifically requested by the defendant. Although the defense obtained the material from other sources a few days before trial, the district court barred introduction of the undisclosed evidence at trial. The Third Circuit held that the sanction constituted an abuse of the court's discretion, reasoning:

> There can be no violation of Brady unless the government's nondisclosure infringes the defendant's fair trial right. Higgs, 713 F.2d [39, 42 (3d Cir. 1983).] To constitute a Brady violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant. United States v. Campagnuolo, 592 F.2d 852, 861-62 (5th Cir. 1979). "No denial of due process occurs if Brady material is disclosed in time for its effective use at trial." Higgs, 713 F.2d at 44; see also Kaplan, 554 F.2d at 580. Moreover, "the government is not obliged under Brady to furnish a defendant with information which he already has or,

---

[8] To be sure, knowledge of the confession would have altered the defense lawyer's opinion of what type of strategy should be employed. Ms. Fleetwood testified that she would have counseled Martinez to defend on a self defense theory. (Tr. 97.) This hindsight is irrelevant for two reasons. First, it is beyond the scope of the Martinez test, which asks only if the element of the nondisclosure's unfairness would be removed had the defendant told counsel the truth. 780 F.2d at 309. We ended this inquiry with an affirmative answer. Moreover, there is nothing in the record to suggest that Martinez, because of family pressures, would have abandoned the alibi defense that he obstinately pursued despite repeated warnings by his lawyer of the strength of the government's case. (Tr. 86-87.)

> with any reasonable diligence, he can obtain himself."
> Campagnuolo, 592 F.2d at 861.
>
>> Here, because the defendant suffered no prejudice from the government's failure to disclose the report, there was no Brady violation. Defense counsel's independent discovery of the statement—fortuitous though it was—negates any argument that the defendant was deprived of rights assured by the Constitution. Absent a showing of prejudice, we conclude that the district court abused its discretion in basing its preclusion order on a violation of Brady.

Starusko, supra at 262 (footnote omitted).

This is, of course, the essence of the Third Circuit's proposed test. See Martinez, supra at 309. The Starusko element of counsel's knowledge is replaced with the requirement that the value of the undisclosed information stem solely from the lawyer's ignorance of it. Under either test, the Brady claim must be found to be meritless once it is determined that either the defendant or his lawyer had possession of the material that the government failed to disclose.

Accordingly, we hold that Martinez suffered no Brady violation because but for his untruthfulness, the confession had no value to his case. The remaining consideration is whether the goal of encouraging desired prosecutorial conduct is outweighed by Martinez' actions. Martinez, supra at 309.

This issue is best resolved by the relative culpability of the parties. The prosecutor was not actively at fault because he did not conceal the confession deliberately. We penalized the government despite this lack of intent by imputing knowledge of the confession to the prosecutor.

Martinez, on the other hand, deliberately lied. First, he lied to his lawyer, thereby vitiating his Brady claim. Then according to plan, he perjured himself before this Court by staging an alibi defense. His conduct is more reprehensible because it was calculated. We will neither condone this conduct nor give Martinez a second chance to assert a defense he was well aware of, but refused to pursue at trial. The prosecutor's conduct, in contrast to the defendant's, does not warrant the granting of a new trial.

### III. CONCLUSION

A defendant who deliberately conceals a police confession from his lawyer vitiates an otherwise valid Brady claim unless the confession is independently material to his defense. Having found

410

that Martinez' confession is material only because he lied to his lawyer, we will deny his motion for a new trial.

## ORDER

THIS MATTER is before the Court on the motion of defendant Juan Martinez for a new trial. The Court having filed its Memorandum Opinion of even date herewith, and the premises considered, now therefore it is

ORDERED:

THAT the motion of defendant Juan Martinez for a new trial be, and the same is hereby DENIED.