GOVERNMENT OF the
VIRGIN ISLANDS

v.

MARTINEZ, Juan A.

Appeal of Juan MARTINEZ.

No. 86–3576.

United States Court of Appeals,
Third Circuit.

Argued April 30, 1987.

Decided Oct. 14, 1987.

Michael A. Joseph (argued), Christiansted, St. Croix U.S. Virgin Islands, for appellant.

Andrew J. Reich, U.S. Atty's. Office, Christiansted, St. Croix U.S. Virgin Islands, Sara Criscitelli, (argued), Dept. of Justice, Washington, D.C., for appellee.

Before SEITZ, HIGGINBOTHAM and ROSENN, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, JR., Circuit Judge.

This appeal returns to us a novel question under the due process doctrine of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Government of the V.I. v. Martinez,* 780 F.2d 302 (3d Cir. 1985) ("*Martinez I*"), we remanded appellant's *Brady* claim to the district court for additional factfinding. The district court concluded that appellant had vitiated his otherwise valid *Brady* claim because the materiality of his statement to a police officer derived only from the fact that he had deliberately concealed from his lawyer the information contained in his statement. *Government of the V.I. v. Martinez,* 642 F.Supp. 1571, 1584 (D.V.I.1986). We will affirm the district court's denial of appellant's motion for a new trial.

### I.

The facts underlying this appeal have been set forth in considerable detail by this Court and by the district court. *See Martinez I,* 780 F.2d at 303–05; *Martinez,* 642 F.Supp. at 1572–80. Drawing from those comprehensive accounts, we summarize matters as follows:

Appellant Juan A. Martinez killed Felipe Gomez on March 4, 1984. Rejecting Martinez's alibi defense, a jury subsequently convicted him of first degree murder. Later that day, during a sentencing proceeding, Martinez revealed that, in a conversation with Detective Oscar Vigo four days before the trial began, he had confessed to killing Gomez. The essence of Martinez's statement to Vigo was that Gomez was armed with a shotgun when he went to the apartment where Martinez was staying, intending to kill him, and that when Gomez pointed this shotgun at Martinez, Martinez killed Gomez in self-defense. Martinez never told his lawyer of this version of events or of his statement to Vigo, however, and the statement was not disclosed to defense counsel or introduced at Martinez's trial. Martinez ultimately was given a life sentence without parole.

Pursuant to Federal Rule of Criminal Procedure 33, Martinez moved for a new trial. His motion argued that the prosecution's failure to disclose his statement to Vigo violated Martinez's constitutional right, under *Brady* and its progeny, to a fair trial. Although the district court denied the Rule 33 motion, we remanded the matter to the district court for an evidentiary hearing and for specific factual findings. *Martinez I,* 780 F.2d at 311.

The district court, which followed with care the dictates of our initial opinion, has substantially clarified the factual setting of this dispute. On remand, the district court found the following: (1) Martinez's statement to Vigo was given voluntarily; (2) this statement was never reduced to writing by any police or prosecution official, and thus was not covered by Martinez's specific discovery request; (3) although Vigo investigated Martinez's story, the prosecution derived no additional exculpatory evidence from Martinez's statement to Vigo; (4) there was no additional exculpatory evidence to be derived from Martinez's statement to Vigo; (5) the prosecutor had no actual knowledge of this statement until it was recounted by Martinez at the sentencing proceeding; [1] (6) Martinez was able, in terms of his English language aptitude and his understanding of the systemic role of a public defender, to communicate truthfully with his trial attorney; and (7) knowledge of Martinez's statement to Vigo would have altered drastically the advice he received from his trial counsel. On appeal, Martinez disputes none of these findings. Brief and Appendix for the Appellant at 2.

After developing this expanded factual record, the district court denied Martinez's

---

1. In *Martinez I,* we suggested, without actually deciding the issue, that the prosecution's ignorance of Martinez's statement to Vigo would not necessarily defeat appellant's *Brady* claim. *See* 780 F.2d at 308 & n. 8. On remand, the district court, relying upon our directive and following Supreme Court precedent, imputed to the prosecutor knowledge of Martinez's statement. *Martinez,* 642 F.Supp. at 1581 (citing *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196, and *United States v. Agurs,* 427 U.S. 97, 110 & n. 17, 96 S.Ct. 2392, 2400 n. 17, 49 L.Ed.2d 342 (1976)).

remanded new trial motion. It concluded in essence that, although the government's failure to disclose Martinez's statement to Vigo constituted a *Brady* violation that otherwise would entitle Martinez to a new trial,[2] the violation was cured by Martinez's willful failure to disclose his statement to his trial attorney. Martinez has appealed the district court's denial of his new trial motion, and our jurisdiction is conferred by 28 U.S.C. § 1291 (1982). As we read Martinez's briefs, he advances three distinct arguments: (1) that he, similarly to the defendant in *Nagell v. United States*, 354 F.2d 441 (5th Cir.1966), was incapable of communicating truthfully with his attorney; (2) that his knowledge and concealment of his statement to Detective Vigo did not legally vitiate his otherwise meritorious *Brady* claim; and (3) that the district court improperly weighed the legal importance of encouraging scrupulous prosecutorial conduct when it in effect sanctioned Martinez for concealing his statement from his attorney. We will address these arguments in turn.

## II.

In *Nagell*, the Court of Appeals for the Fifth Circuit reversed a district court's denial of a new trial motion based upon newly discovered evidence. This evidence, which was known to defendant Nagell but was not disclosed to his attorneys until after he had been convicted for an abortive attempt to rob a bank, concerned "serious organic brain damage" that Nagell had previously suffered in an airplane crash. 354 F.2d at 445–46. This evidence was contained in an FBI report of an interview with a neurologist and psychiatrist who had intensively studied Nagell's brain injury, but it was not disclosed despite the government's assurance to "counsel that all documents material to Nagell's case would be made available to them." *Id.* at 446. The evidence indicated this medical expert's inability to say that Nagell "was reasonably able ... factually [to] confer with his attorney or to raise a defense." *Id.* at 447.

Martinez, drawing an analogy to *Nagell*, claims that he was incapacitated by family pressure from communicating truthfully with his attorney concerning the fact that he had killed Gomez. He therefore contends that his foreknowledge of his statement to Detective Vigo admitting as much should not negate his *Brady* claim. The district court, in a brief footnote, dismissed this claim as "ludicrous." *Government of the V.I.*, 642 F.Supp. at 1583 n. 7.

We will affirm the district court's rejection of this argument. The record indicates that Martinez didn't want his family to find out that he had killed Gomez. It also indicates that Martinez's father had threatened to kill himself if his son ever got into this kind of serious legal trouble.[3] In addition, Martinez's court-appointed trial counsel, Martha Fleetwood, testified to the district court that she

> really spent a lot of time with Mr. Martinez ... trying ... to get him to understand the position he was in and why he should assert himself more independent-

---

2. The district court believed that "the Third Circuit [had] held that the confession [contained in Martinez's statement to Vigo] was material" evidence that should have been disclosed under *Brady*. *Martinez*, 642 F.Supp. at 1581. This reading of *Martinez I*, while perhaps generous to appellant, is fundamentally accurate. *Compare* 780 F.2d at 306 ("If the evidence sought by Martinez had been disclosed, there appears to be a 'reasonable probability' that the result of his trial would have been different.") (quoting *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985)) *and* 780 F.2d. at 316 ("The majority holds that *Brady* may be applied to require the government to turn over to a defendant or his [or her] attorney information, such as the defendant's own statements, [that] the defendant already possesses") (Garth,

J., dissenting) *with* 780 F.2d at 307 ("there remain unresolved 'genuine issues of material fact' ... as to whether a *Brady* violation took place") (quoting *United States v. Dansker*, 565 F.2d 1262, 1264 (3d Cir.1977)). We, like the district court, are constrained by the prior decision of this Court not to revisit this legal question.

3. Ironically, Martinez's desire to protect his family from learning that he had, in truth, killed Gomez is reflected by the fact that he allowed his father, brother and two sisters to corroborate his alibi defense—i.e., to perjure themselves—at his trial. *Martinez I*, 780 F.2d at 304.

ly from his family. But he wasn't able to.

. . . . .

... I really felt that he was behind some wall, and the wall was his family. And, that neither I nor anybody else was going to be able to walk over the wall. It was—it was something that was holding him back from standing on his own two feet and making a decision.

. . . . .

I think he was ... [incapable of communicating truthfully with his attorney], the reason being this family role that kept him from independently making a decision.

. . . . .

... [H]e was not using independent decision making.

. . . . .

... [That d]efinitely [relates to his family situation]. I saw it in their actions.

642 F.Supp. at 1579.

As a matter of legal doctrine and common sense, we are unable to equate this case with *Nagell.* The latter involved a defendant whose mental disorders were readily apparent from his conduct at every stage of his legal proceedings, whose mental competency to stand trial was so obvious an issue that he was transferred to a federal facility for psychiatric evaluation, whose condition made him an obvious candidate for the legal exculpation of the insanity defense, and whose concealment from his attorney resulted from the very fact he concealed: his damaged brain and diseased mind. *Nagell,* 354 F.2d at 449. In each of these respects, Martinez's situation is less compelling than was Nagell's. We do not believe that Martinez's motive is the equivalent of a physical or mental defect in the way it could disable a defendant from communicating truthfully with his or her attorney. For that reason, we do not believe that the district court abused its discretion when it denied this aspect of Martinez's new trial motion.

## III.

■ Our initial opinion in this matter "merely note[d] the complexities raised by a defendant's dishonesty" with his or her attorney, *Martinez I,* 780 F.2d at 309; we chose to await the district court's development of "a more complete record before attempting to formulate any necessary rule" to govern such cases. *Id.* We did, however, "sketch the contours of the argument" concerning "the effect of a defendant's untruthfulness on a *Brady* claim." *Id.* at 308. As we explained in *Martinez I,* the linchpin of this argument is the contention

> that where evidence is material ... only as a result of the defendant's lying to counsel, the defendant may not invoke *Brady* to win a new trial. Under this view, when making the materiality judgment, the court is limited to considering whether there is a reasonable probability that disclosure would have led to a different outcome even if the defendant had not lied to his attorney. Thus, a *Brady* violation would occur only where, assuming the defendant had been candid with his attorney, the nondisclosed evidence would still be of significant value to the defendant's case.

*Id.* at 309. The district court concluded that this is not such a case: "The bottom line is that the confession was material to Martinez's defense solely because of his own untruthfulness." *Martinez,* 642 F.Supp. at 1583.

Martinez, in his reply brief, contends that this conclusion is legally erroneous. He relies on this Court's decision in *United States ex rel. Butler v. Maroney,* 319 F.2d 622 (3d Cir.1963), granting the habeas petition of a convicted criminal who, at trial, was denied access to his statement to police recounting a spontaneous admission by the only living witness to petitioner John Butler's crime. The statement was not disclosed by the prosecution until its cross-examination of Butler during the sentencing phase of his capital case. We held there that nondisclosure of this statement— which recounted an admission by the witness that appeared to this Court to be

consistent with the physical evidence, was at odds with the witness's trial testimony and was inconsistent with the trial court's jury charge, *see id.* at 626—denied Butler's due process rights under *Brady. Id.* at 627. We did not, in *Maroney,* discuss the extent of Butler's knowledge of his undisclosed statement or the effect thereof on his *Brady* claim. According to Martinez, our failure in *Maroney* to address such issues means that they are not, in the course of evaluating a *Brady* claim, to be taken into account by federal courts in this Circuit. We disagree.

*Maroney* is distinguishable from the present case. Initially, we note our agreement with the district court's understanding of *Maroney* as "a case where the prosecution ambushed a defendant with *Brady* material." *Martinez,* 642 F.Supp. at 1583. In this case, by contrast, the statement was never related by the police to the prosecution, and thus could not have been—and was not—used by it at Martinez's trial. Thus, while an absence of actual prosecutorial knowledge may not be dispositive of the "failure to disclose" element of a *Brady* claim, it does negate the possibility of an ambush at trial. We also note the district court's finding that "Martinez remembers [to this day] the precise details of his confession...." *Id.* at 1582. Although the *Maroney* opinions [4] are silent on this point, that case only makes sense when viewed as an instance where the defendant simply did not recall a crucial, but isolated and passing, detail contained in his statement to the police.[5] *Cf. Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 1007, 89 L.Ed.2d 123 (1986) ("after reflection, the most honest witness may recall (or sincerely believe he recalls) details that he previously overlooked") (Stevens, J., concurring in the judgment). In sum, we conclude that *Maroney* does not stand for the proposition that a defendant's lasting knowledge of the salient information contained in his or her undisclosed statement is irrelevant for purposes of a *Brady* analysis.

The district court correctly identified what strikes us as dispositive: if Martinez had been candid with his attorney, nondisclosure of his statement by the government "could have had no impact on his defense." *Martinez,* 642 F.Supp. at 1583. As Fleetwood explained to the district court on remand, if Martinez had told her his true story she "would have probably been able to present a more self defense [sic] case and get him off on a much lower charge, if not off completely." *Id.* at 1580. The cause of her inability to do so was her client, not the government. On these unusual facts, such an anomaly rectifies whatever *Brady* violation the government would otherwise be faulted for committing. *Cf. United States v. Starusko,* 729 F.2d 256, 262 (3d Cir.1984) ("because the defendant suffered no prejudice *from the government's failure to disclose* ..., there was no *Brady* violation") (emphasis added); *United States v. Dansker,* 565 F.2d 1262, 1265 (3d Cir.1977) (defense foreknowledge "may cure prosecutorial non-disclosure"), *cert. dismissed,* 434 U.S. 1052, 598 S.Ct. 905, 54 L.Ed.2d 805 (1978); *Nagell,* 354 F.2d at 448–49 ("If the concealment had come from a sound mind," the new trial motion would be denied.).

## IV.

▮ In *Martinez I,* we identified, as a "counterargument" to the limit on *Brady* materiality set forth in the preceding section, the contention "that the *Brady* rule has little to do with lying, but instead aims to encourage desired prosecutorial conduct [so as] to promote fair trials." 780 F.2d at 309. Martinez claims on appeal that the district court struck the wrong balance when it based its decision on "the relative

---

**4.** In *Maroney,* Judge Ganey, joined by Judge Hastie, wrote for the Court. Judge Kalodner wrote a dissenting opinion.

**5.** There is no indication in *Maroney* that defendant Butler was not fully cooperating with his defense attorney. As we read the decision, it seems plausible that the defense resorted to an insanity plea because no one, including Butler, knew of objective evidence suggesting that the shooting at issue might have been accidental. *Cf. United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 3396–97 n. 7, 87 L.Ed.2d 481 (1985) (Marshall, J., joined by Brennan, J., dissenting) (summarizing the facts of *Maroney* ).

culpability of the parties." *Martinez*, 642 F.Supp. at 1584. We disagree.

Martinez's claim suggests a number of factors that, he argues, the district court failed to consider. One factor is his belief that the government shouldn't profit from his faith in the legal system. As we understand this argument, it reflects Martinez's belief that he preserved his *Brady* claim forever once he decided to confide in Detective Vigo. Related to this contention is Martinez's argument that his confidence in the police is what distinguishes his situation from that of anyone else who lies to his or her criminal defense attorney. As the district court noted, however, Martinez did much more than lie to Fleetwood. He also lied to the district court when he and his family members staged a perjured alibi defense.[6] *Martinez*, 642 F.Supp. at 1584. The prosecution, by contrast, did "wrong" only under the fiction of implied knowledge. *See supra* note 1.

Martinez also claims that the nondisclosure of his statement was to the government's advantage because it stuck him with a very weak alibi defense. Although this claim is not without force, it too assumes that the nondisclosure was the result of a conscious prosecutorial decision. The district court's factual findings on remand demonstrate that this is simply not what occurred in this case. What did occur —i.e., what was the true cause of the nondisclosure to Fleetwood—was Martinez's decision not to tell his true story until it was too late.[7] We cannot say that the district court abused its discretion when it concluded that granting this new trial mo-

tion would not, on balance, contribute to sound prosecutorial practices.

## V.

For the foregoing reasons, we will affirm the district court's denial of appellant's new trial motion.

---

**6.** The Supreme Court has consistently emphasized the gravity of perjured testimony. *See, e.g., Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986) ("Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely.* . . . [T]here is no right whatever—constitutional or otherwise—for a defendant to use false evidence.") (original emphasis); *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d (1971) ("Every criminal defendant is priviledged to testify in his [or her] own defense. . . . But that privilege cannot be construed to include the right to commit perjury. . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and ac-

curately. . . .") (citations omitted); *In re Michael*, 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30 (1945) ("All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. . . . [I]t tends to defeat the sole ultimate objective of a trial.").

**7.** "There is no gainsaying that arriving at the truth is a fundamental goal of our legal system. . . . [The Supreme Court] ha[s] repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences." *United States v. Havens*, 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980) (citation omitted).