**Richard Case NAGELL, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 21620.**

United States Court of Appeals Fifth Circuit.

Jan. 4, 1966.

442

Gus Rallis, Joseph A. Calamia, E. F. Sherman, El Paso, Tex., for appellant.

M. H. Raney, Asst. U. S. Atty., El Paso, Tex., Ernest Morgan, U. S. Atty., San Antonio, Tex., Fred J. Morton, Harry Lee Hudspeth, Asst. U. S. Attys., El Paso, Tex., for appellee.

Before TUTTLE, Chief Judge, COLEMAN, Circuit Judge, and HUNTER, District Judge.

COLEMAN, Circuit Judge:

This appellant was convicted by a jury of having entered a federally insured bank with intent to rob and of attempting to commit robbery in violation of 18 U.S.C.A. § 2113(a). He was sentenced to the maximum penalty of ten years in the custody of the Attorney General. He elected to begin serving the sentence pending appeal.

The record shows that late in the afternoon of September 20, 1963, appellant went into the State National Bank of El Paso, Texas. He asked where travelers' checks could be obtained, and upon reaching the proper cage asked the lady teller for one hundred dollars worth of checks in ten dollar denominations. The teller moved to get them, whereupon Nagell said, "Lady, this is a real gun". She immediately ran, and appellant took several steps away from the cage, fired two shots into the wall at a height of about seven feet, not aiming at the teller, and ran out of the bank. He was followed by a police officer who happened to be in the bank at the time. He was, without difficulty, arrested at a time when he was about to leave in an automobile which he had left parked near the bank.

The appellate record consists of some eight hundred typewritten pages, and it has been carefully read in its entirety.

On this appeal, seven grounds are raised in support of reversal. We are ready to say, without extended discussion, that six of these may confidently be rejected; that (1) the evidence failed to show the requisite intent; (2) sanity was not shown beyond a reasonable doubt; (3) a continuance was erroneously denied; (4) reversible error was committed in the examination of witnesses and in argument to the jury; (5) court appointed attorneys were lulled by erroneous representations by the government that all available evidence bearing on defendant's mental condition would be made available to them; and (6) the

court erred in its charge on the defense of insanity.

The seventh ground, contending that a new trial should have been granted on account of crucial evidence newly discovered, must be sustained.

I

At the time of the trial, Nagell was thirty-three years old. He was born in Greenwich, New York. His father died when he was two years old. Under circumstances not explained in the record, he was separated from his mother when he was four. He lived in various foster homes until he was eleven, and in an orphanage until he was eighteen. He then enlisted in the Army, 1948. He became a paratrooper, but in 1951 went to Korea with the 24th Infantry as a second lieutenant. He served a year in Korea, was rotated home, but immediately went back at his own request. On three separate occasions he was wounded in action. In 1954, he was a passenger in a military airplane enroute from Los Angeles to Washington. The plane crashed while attempting a landing at Friendship Airport, killing all occupants except Nagell. He sustained severe head injuries, including organic brain damage, although this damage, as will be seen, was unknown to the trial judge or defense attorneys until after the trial now under review. He was hospitalized in Walter Reed Hospital, was later returned to duty through some machinations of his own, and resigned from the service under honorable conditions. He drew 64% service connected disability compensation, but not for a mental condition. In 1958, at the American Embassy in Tokyo, he was married to a Japanese subject. They had two children, but the marriage had gone on the rocks before September, 1963. He later worked for the State of California, but lost that job. In August, 1962, he shot himself through the left chest. He originally claimed this was done by an assailant whom he refused to name; it later came out that the shot was self-inflicted. He testified in his own behalf. He was asked by his own counsel if he adhered to the communist philosophy, to communist teachings, but he declined to answer on the ground that it might incriminate him, although he had told the court in an earlier hearing that he was a communist. He contended that he did what he did at the bank not for robbery but in order that he might be arrested by federal authorities. He refused to elaborate on why he wanted to be arrested other than to say he "thought it would provide a solution, however temporary or immediate, to a problem, that I considered at the time to be an unbearable problem with which I was confronted". He said that before he went to the bank he was in the process of leaving the United States permanently. He said, "I was planning on going to Mexico City, where I would have left Mexico for another destination and I would have gone permanently from this country". He insisted that if acquitted he planned to leave, because he had "had every basic Constitutional right violated". He made this latter charge in face of the fact that this record reveals a most meticulous effort and an almost superhuman patience on the part of two district judges to preserve his rights.

II

We now advert to certain occurrences which took place before, during, and after the trial.

From the outset, the defendant in many ways manifested the most unusual behavior. The possibility of insanity was quickly recognized. Four days after the arrest the government filed a motion for a judicial determination of the mental competency of the defendant, "there being reasonable cause to believe that said defendant may be presently insane or otherwise so mentally incompetent as to be unable to assist in his own defense". The motion stated that the records of the Veterans Administration Hospital, at Bay Pines, Florida, showed the defendant to have been released from that facility on January 20, 1963, with diagnosis of "chronic brain syndrome associated with brain trauma with behavioral reaction characterized by passive-aggressive and

paranoid features". It was further shown that the records of the Veterans Administration Outpatient Clinic at Los Angeles, California, on June 4, 1963, about three months before the alleged crime, had shown a diagnosis of "depressed, tearful, nervous, and rigid". It was further shown that the regular jail physician at the El Paso jail recommended that the defendant should be examined by a psychiatrist "due to unusual behavior on the part of the defendant".

The district judge directed that Nagell be given a mental examination by Dr. R. J. Bennett, a qualified psychiatrist of El Paso, and report his findings. On October 11, 1963, Dr. Bennett reported that on two occasions he had attempted to examine Nagell, without success, because he was unwilling to give any information.

Thereafter, the district court ordered that Nagell be transported to the Medical Center for Federal Prisoners at Springfield, Missouri, to be confined to such institution for a period of thirty days, after which the appropriate officials were to make their report of findings and conclusions as to his mental competency. On March 6, 1964, the chief medical officer at Springfield reported that Nagell was "opposed to psychiatric examination and will not cooperate in this area or any examination that may be performed on him". The diagnosis was that he was competent to stand trial, as he had a rational as well as factual understanding of the proceedings against him and is able to assist rationally in his defense.

The court first appointed Mr. James E. Hammond of the El Paso Bar, to represent Nagell. The hearing on November 4, 1963, held at the instance of the defendant, revealed that Nagell did not desire the services of Mr. Hammond because, as Nagell charged, he had disclosed some confidential information, which Mr. Hammond denied. During the course of this hearing, the defendant stated that he would "cooperate with no psychiatrist whatsoever or whomsoever unless they are Veterans Administra-

tion psychiatrists, because if anything is found to be wrong with me then it occurred as result of injuries during the Korean conflict, and they can send me to La Tuna, (a mental institution) but I will not do anything voluntarily and I will not take any examinations nor will I converse with the psychiatrist". When asked by the court if he would answer any questions by the psychiatrist, the defendant stated that he would not, and that he would not take any examinations. It was pointed out to him that he could not be sent to a Veterans Administration hospital because such institutions had no facilities to insure his detention. Upon suggestion of some other hospital the defendant stated, "well, your Honor, I am not a liar so I would not want to say that I will cooperate with him fully. I will not tell him what my motive was for going into the bank".

Thereafter, the court appointed Mr. John Langford, of the El Paso Bar, to represent Nagell, but a hearing held on December 4, 1963, revealed that Nagell was not satisfied with Mr. Langford. So, Mr. Langford was excused as counsel. Defendant launched into a long discourse on contentions that he was being denied a speedy trial, during which he cited the case of Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 in support of his views. The defendant stated that he believed himself to be mentally competent.

At a third hearing, on January 24, 1964, the defendant denied that he had ever been treated by a psychiatrist. He alleged that he had been questioned by the Federal Bureau of Investigation regarding alleged subversive activities and activities of a nature inimical to the best interest of the United States, that he had been asked questions by the Secret Service regarding Lee Harvey Oswald, and stated that he did not desire any psychiatric examination. He contended that his military records and Veterans Administration records would prove that he had no psychosis whatever. Defendant told the court that he would not partici-

pate in any psychiatric examination or consultation.

At a fourth hearing, held on March 24, 1964, the defendant pointed out that he had been without counsel since December 9, 1963, and requested that counsel be appointed.

As a result the court appointed Messrs. Gus Rallis and Richard B. Perrenot to represent the defendant. The case was called on March 30, 1964, and continued for the purpose of allowing counsel additional time in which to prepare for trial.

On April 10, 1964, at a hearing involving a subpoena for certain records desired by the defendant, the defendant stated "I think that I am being railroaded because I am a communist and because I have been accused of being an espionage agent".

On April 20, 1964, the case was again called at which time Mr. Perrenot was allowed to withdraw as counsel, because of basic disagreements with the defendant, and after prolonged efforts to reason with the defendant, Mr. Joseph A. Calamia was substituted for Mr. Perrenot. Defendant stated that he would not accept Mr. Perrenot to represent him. "I wouldn't accept Mr. Perrenot to represent me if it meant I would have to go to prison the rest of my life." That afternoon Mr. Calamia reported to the court that the defendant was refusing to cooperate in the matter of obtaining complete psychiatric reports on his condition, that he could not safely go to trial without such reports. Defendant again denied any mental disability, he said he knew his own physical and mental condition, that he had already been found to be mentally competent to stand trial (which was true, so far as the Springfield report was concerned) and "as I understand the law, that is all that is necessary. I could be a blithering idiot but if I am mentally competent to stand trial that is all there is to it".

He said that before he would accept insanity as a defense he would stand mute and that under the Constitution of the United States he had that right, that he would not cooperate with his counsel in so far as any defense depended upon mental incompetency. A repetition of the emphasis the defendant placed on this point in even further and additional statements would only add to what must become an unusually lengthy opinion. The upshot was that the court allowed Mr. Calamia and Mr. Rallis to withdraw as counsel and stated that the defendant "will prepare his own defense".

The next day, Nagell had a change of heart and Mr. Calamia and Mr. Rallis came back into the case.

On April 23, a continuance was granted until May 4th, on which date the case went to trial.

It might be said, in a sense, that the trial had many unusual, unexpected, and bizarre aspects. Despite the best efforts of the trial judge to contain him and control him, Nagell would interrupt witnesses on the stand, calling them liars, and he would jump up and shout that he was not insane.

Four doctors were called to the stand. Dr. Manuel Hernandez, of El Paso, a psychiatrist, testified that on Sunday, April 26, at the instance of Mr. Calamia, he examined the defendant in jail. He saw him for an hour and forty-five minutes, followed by another interview on a later date that lasted for about an hour. He arranged for psychological tests to be conducted by Dr. Richard Walker, of El Paso. He also had the benefit of consulting certain Veterans Administration records which had been forwarded from Los Angeles. It was the opinion of Dr. Hernandez that the defendant had been "suffering a serious mental or emotional illness on September 20, 1963". He thought "the defendant was a schizoid personality with rather strong paranoid features". He thought the defendant's condition was such as to preclude him from controlling his conduct and refraining from doing what he did when he entered the bank. He stated further, however, that the mental disorder suffered by the defendant would not render him unable to distinguish between right and wrong. Nothing was said about serious

organic brain damage in the airplane accident of 1954. The defendant interrupted the testimony of Dr. Hernandez to ask if there was any issue of his competency, "for which I have already been found competent?" At a later point, Dr. Hernandez testified that he did not believe the defendant was capable of formulating an intent to rob on September 20, 1963. On cross-examination, Dr. Hernandez repeated the opinion that the defendant did have the capacity to distinguish right from wrong on September 20, 1963.

Dr. R. J. Bennett, a psychiatrist, next took the stand. The defendant protested that it was his understanding that Dr. Bennett would not take the stand. After a talk with his counsel, he subsided and the examination proceeded. Dr. Bennett said that he was unable to conduct an examination of the defendant, because he refused to talk. Defense counsel then propounded a hypothetical question seven pages in length, to which the defendant personally objected. After a parley with the doctor on the witness stand, the defendant again objected and said, "I want a defense but I am not after a defense at any cost or any price." After conference with his counsel, he subsided and Dr. Bennett offered the opinion that Nagell was suffering from a paranoid condition. The defendant personally objected to this answer. Dr. Bennett then testified that Nagell could distinguish between right and wrong on September 20, 1963. The defendant then wanted to make a motion, after which the court sent him out of the courtroom, in the custody of the marshal, and in the company of his counsel. Apparently Nagell quietened down and the trial proceeded.

Dr. Martin L. Schwartz, Staff Psychiatrist for the Veterans Administration, Highland Park, Illinois, was called as a witness for the government. He had been acquainted with Nagell at the Bay Pines, Florida, Veterans Administration Hospital in January, 1963. He observed Nagell at Bay Pines for only one week, after which Nagell was staffed and allowed to leave. He there objected to questions and the interview was not completed. The doctor had later talked to him privately, from which he thought that Nagell had no delusions or hallucinations, that in January, 1963, Nagell was not psychotic, showed no bizarre behavior, was in good contact with reality, and would know right from wrong. Again, the organic brain damage sustained in the airplane accident of 1954 was not mentioned.

Responding to a hypothetical question, Dr. Schwartz thought that Nagell could distinguish between right and wrong on September 20, 1963.

Dr. Gustave J. Weiland, Staff Psychiatrist at Springfield, next testified for the government. Responding to a hypothetical question by the government, which did not include the element of organic brain damage in 1954, Dr. Weiland gave it as his opinion that the defendant would have known the difference between right and wrong on September 20, 1963.

Between May 6th and June 8th, the defendant began to talk freely with his counsel. Some rather startling facts, hitherto unknown to anyone but the defendant, were unearthed. The result was a full evidentiary hearing on a motion for a new trial.

The second witness was an F.B.I. agent who had constantly been engaged in the case since the occurrence first took place on September 20, 1963. He testified that he first learned of Dr. Edwin A. Weinstein in an interview with the defendant. He then caused Dr. Weinstein to be interviewed by an Agent in Washington. This information, and the report received, had not been tendered to counsel for defendant prior to or during the trial on the merits, although the government, in good faith, had assured counsel that all documents material to Nagell's case would be made available to them.

Pursuant to subpoena, Dr. Weinstein took the stand. We do not here detail his extensive and impressive qualifications. Suffice it to say that for the past ten years he had been a consultant in neurol-

ogy and psychiatry for the Walter Reed Army Institute of Research, for the National Naval Medical Center, and the Veterans Administration. For the past five years he had been working on a research contract with the Surgeon General's Office on the investigation of behavior changes following brain injuries. He was the author of many articles on the effect of brain injury. He wrote the chapter on changes of behavior after brain injury in the Handbook of Psychiatry. He had written a monograph concerning the denial of illness in the behavior of subjects following brain injury. He testified that in his research project with the Walter Reed Hospital he had been familiar with the case of Richard Nagell. He had given the Nagell case intensive study. He had attempted to keep in touch with Nagell, after his release from Walter Reed, but could obtain no reply to his inquiries. He said Nagell had apparently suffered a fracture through the base of his brain, which injured the underside of the brain, and not only damaged the brain but some of the cranial nerves coming off the brain. He described Nagell's "rather long, stormy, and tragic course" in the hospital. He had a fracture through the orbit and a broken jaw. There was extensive laceration and scarring of the face. He attacked the corpsmen who had charge of him at the hospital. There was behavior interpreted as a suicidal gesture, resulting in his being locked in a psychiatric ward as a precaution against suicide. He was hospitalized from November, 1954, until May, 1955, The doctor did not see him from April 28, 1955 until he interviewed him on June 5, 1964. He got a letter from Nagell dated January 10, 1963, while he was at Bay Pines hospital. He received another letter about two weeks later. These were fully set forth in the evidence. Dr. Weinstein had examined the records from Bay Pines. He testified that unless a psychiatrist had an accurate history of what had happened to Nagell in the past, including the brain damage history, he would be very much at sea and confused by the manifestations in his case. He said that one aspect of Nagell's illness, particularly complicating it, had been his denial of illness, and his attempt to conceal information. It was Dr. Weinstein's opinion that Nagell could not completely and accurately differentiate between right and wrong. In response to a hypothetical question, detailing what took place at the alleged robbery, and considering the entire history of Nagell's case, he said, "I would say that this was a symptom or a manifestation of disturbed brain function and during the period his judgment and perception of reality was seriously disturbed so that he could not accurately differentiate right from wrong", that, in his opinion, Nagell was disassociated with reality at the time of the incident. He gave it as his opinion that the act at the bank on September 20, 1963, was directly related to Nagell's mental illness, that the act was an alternative to suicide. He said the brain damage sustained by Nagell did not affect the ordinary components of intelligence and that he did have sufficient intelligence to know the nature of the charges against him, but that he would hesitate to say that he was reasonably able to factually confer with his attorneys or to raise a defense. The government sought to question, if not impeach, the testimony of Dr. Weinstein by showing that in an interview with F.B.I. Agent McDonald, he had made certain statements inconsistent with his testimony, to which Dr. Weinstein stated that not being a doctor, Mr. McDonald may have misunderstood him in writing the report which he sent to El Paso.

Dr. Hernandez, who had testified at the trial on the merits, took the stand. He said that Dr. Weinstein would be considered a foremost authority on brain injuries, that he did not know anyone better in this country. Dr. Hernandez stated that after consulting with Dr. Weinstein and further interviews with Nagell, he would change the testimony he gave on the original trial and would now be of the opinion that Nagell was not

able to distinguish right from wrong on September 20, 1963.

Dr. Joseph J. Hornisher, a Board certified specialist in psychiatry, was the next witness. He was a retired Army doctor. He had been consulted about the case after the trial on the merits. He agreed with Dr. Weinstein that Nagell was suffering from Anton's disease, which would cause him to deny mental illness and to do anything he could to mislead others with reference to it. He agreed with Dr. Weinstein's diagnosis of organic brain disease. He did not believe that Nagell could distinguish between right and wrong on the day of September 20, 1963.

Dr. Martin L. Schwartz, who had testified for the government at the trial on the merits, was the next witness. He said that when he testified at the trial he did not have the entire Veterans Administration file. He did not know of Nagell's brain injury. After hearing the testimony of Dr. Weinstein, and receiving additional facts, he was willing to concede that Nagell has a mental disorder, but declined to say how serious it was.

### III

In Newsom v. United States, 311 F.2d 74 (1962) this Court said, "Seldom indeed will this Court reverse a district court for refusing to grant a new trial." The circumstances, however, were such that the denial of a new trial was there reversed.

■ In Ledet v. United States, 297 F.2d 737 (1962) this Court laid down the standards as follows:

"We must, of course, bear in mind the well known principle that ordinarily the granting or denial for a motion for a new trial on the basis of newly discovered evidence rests in the sound discretion of the trial court, and even where a clear case for the granting of a new trial might otherwise appear, the movant must ordinarily meet the following requirements:

"1. The evidence must be discovered following the trial.

2. Facts must be alleged from which the court may infer diligence on the part of the movant to discover the new evidence.

3. The evidence must not be merely cumulative or impeaching.

4. The evidence must be material.

5. The evidence must be such that a new trial would probably produce a new result."

In that case a new trial was awarded.

The opening sentence of Rule 33 of the Rules of Criminal Procedure provides, "[t]he court may grant a new trial to a defendant if required in the interest of justice."

In Brodie v. United States, 1961, 111 U.S.App.D.C. 170, 295 F.2d 157, it was held, "Under Rule 33 Fed.R.Crim.P., 18 U.S.C.A., a motion made within five days of the final judgment, as distinguished from one made later but within two years, empowers the trial court to 'grant a new trial to a defendant *if required in the interest of justice.*'"

We agree with this, especially since the whole purpose of the courts is to do justice and prevent injustice.

We are of the further opinion, however, that under the five prerequisites concept of Ledet, supra, the appellant should have been granted a new trial. It is not necessary to hold, and we do not hold, that the denial of the new trial was manifestly unjust. We think the ordinary rules for granting new trials on newly discovered evidence decide the matter. In denying the motion for the new trial the district court made no findings of fact and announced no conclusions of law. We hold that from the undisputed evidence offered in support of the motion all of the five requirements were met.

■ The one which evidently gave the trial court genuine difficulty was the contention of the government, strongly urged there and here, that since appellant all the time knew the crucial facts and concealed them from his counsel then the motion must be denied for lack of diligence. If the concealment had come

from a sound mind this undoubtedly would be right. But the proof is really without substantial dispute that appellant was suffering from a mental disorder which caused, if not compelled, him to follow this course. He is thus no more to be bound by it in a serious matter of this kind than in any other situation involving mental derangement.

As to whether the newly discovered evidence will probably produce a different result, see United States v. Westerhausen, 7 Cir., 1960, 283 F.2d 844.

Here we have a case in which the defendant exhibited no abnormal traits prior to 1954. On the contrary, by his own merit he became an officer in the Army after enlistment at eighteen. He was, to say the least, an outstanding soldier. After brain damage in 1954, a crucial fact which was unknown to the trial jury, he steadily declined to his present unhappy condition. The former valiant soldier who had sustained wounds on three occasions in defense of his Country had become so completely altered that he announced himself in open court to be a Communist. He had made one serious effort to kill himself by a shot in the left chest.

Every doctor who testified at the trial was of the opinion that Nagell could distinguish between right and wrong on September 20, 1963. As a result of the newly discovered evidence, which the defendant concealed as the result of a damaged brain and a diseased mind, three doctors, one of them an outstanding national authority on brain damage, are now prepared to testify that in their opinions he did not then know the difference between right and wrong. This puts an entirely different face on the matter. Of course, we do not decide the merits of the case, but we believe another jury should have an opportunity to decide the guilt or innocence of this man in the light of this new evidence.

New trials are to be granted only with the greatest caution. This is a sound rule. The reasons in support of it are obvious. In directing a new trial in this case we do so on its particular facts. We do not in any way diminish the general rule.

We do not here infer any criticism of the trial court for denying the new trial motion. He was following a well beaten path, after handling with commendable and unusual patience what must have been a most exasperating trial experience.

Reversed, with instructions that a new trial be granted.