891 A.2d 369

**Clarence J. MACK**

v.

**STATE of Maryland.**

**No. 2181, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Jan. 31, 2006.

672

Geore E. Burns, Jr. (Nancy S. Forster, Public Defender, on brief), for appellant.

Devy Patterson Russell (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, THEODORE G. BLOOM (retired, specially assigned), and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, J.

Clarence J. Mack, appellant, was tried on April 8, 2002, before a jury in the Circuit Court for Montgomery County (Woodward, J., presiding), on charges of Attempted Murder in the First Degree, Use of a Handgun in the Commission of a Felony, and Reckless Endangerment. On April 11, 2002, the jury returned verdicts of guilty as to all three offenses. On November 21, 2002, the first of two sentencing hearings was held and was continued, due to an emotional and physical outburst by appellant, until January 9, 2003. Appellant filed two additional motions to continue the sentencing hearing, which the court granted. On April 10, 2003, appellant was sentenced to life imprisonment on the attempted murder charge, and five years imprisonment, to run concurrently, for each of the remaining charges.

On April 9, 2003, appellant filed a motion for a new trial on the grounds of newly discovered evidence. A hearing on appellant's motion for a new trial was scheduled for October 9, 2003 and, on that date, the hearing was rescheduled for February 5, 2004. On February 5, 2004, the court held a hearing to consider appellant's motion; thereafter, the court postponed the hearing until June 17, 2004, to permit appellant's expert to appear at the hearing. The June 17, 2004 hearing was rescheduled by the court for June 24, 2004. The hearing on the motion for new trial proceeded on June 24, 2004. On June 12, 2004, the State filed a motion, which the court denied, for a psychiatric evaluation of appellant by a State-appointed psychiatrist. Thereafter, a petition for writ of certiorari was filed on that issue; the Court of Appeals denied the petition on September 20, 2004. On November 18, 2004, the court denied appellant's motion for a new trial. This timely appeal followed, in which appellant presents one question for our review:

Did the trial court err in denying appellant's motion for a new trial?

We answer appellant's question in the negative. Accordingly, we affirm the decision of the trial court.

## FACTUAL BACKGROUND

### FACTS RESULTING IN APPELLANT'S CONVICTION

On October 20, 2001, appellant, along with Abdul Fofana (referred to throughout the trial by his nickname "Doodoo"), the victim in this case and several friends had congregated in front of the home of Antonio White. At the time, there was a party at a community center across the street from White's home. Members of the group had been drinking alcohol and smoking marijuana and cigarettes that had been dipped in PCP, referred to as "dippers." During this time, a drug transaction was arranged by appellant, between Fofana and an unidentified person attending the party, to purchase fifty dollars worth of cocaine. Appellant and Fofana agreed that appellant would receive a ten-dollar fee for "setting up" the transaction. Appellant and Fofana who, according to the record, knew each other for four to five years, deceived the unidentified purchaser of the cocaine by adding aspirin to the crack cocaine belonging to Fofana. The ensuing transaction between Fofana and the unidentified purchaser, however, did not result in a fifty-dollar net, but rather only thirty dollars. Fofana then informed appellant he would not pay him the ten dollars, as they had agreed. According to White and another State's witness, William Proctor, appellant was angry about not receiving the ten dollars, as promised, and proceeded to urinate in Fofana's car window. Fofana, upon hearing from other members of the group that appellant had urinated in his car, became angry and challenged him to a fistfight to settle the dispute. White testified that appellant and Fofana were going to fight, then shake hands, and go get a drink with the group.

Appellant and Fofana, at the urging of the other members of the group, agreed to the fistfight at a location where the police were not present, in an effort to avoid being arrested. The group proceeded to the new location, the parking lot of the townhouse community where appellant's now ex-girlfriend, Diane Kinzer, resided. The testimony of both Kinzer and White reflects that, upon arriving at the parking lot, appellant

told Kinzer to retrieve a gun. Kinzer testified that she retrieved the gun and gave it to appellant. White testified that both he and James Kinzer, the brother of Diane Kinzer, attempted to persuade appellant not to use the gun. White also stated that James Kinzer wrestled appellant to the ground, but released appellant when he was threatened with the gun. White, Proctor and Fofana all testified that appellant then approached Fofana and began firing the gun at him, hitting him three times. Following the shooting, Fofana testified that appellant told him not to "snitch." White also testified that he was called by appellant and told not to talk to the police and that he should instruct Proctor to do the same.

At the scene, eight twenty-two caliber shells were collected, as well as Fofana's clothing that had been cut off of him by the paramedics. The gun, however, was never recovered. The police searched Kinzer's house and her room and recovered a box of twenty-two caliber ammunition from her closet. A finger print from the box of ammunition was matched to appellant; however, no finger prints were recovered from the eight casings recovered from the parking lot. Appellant was arrested for the shooting after leaving Kinzer's residence.

## FACTS PERTAINING TO THE MOTION FOR A NEW TRIAL

At the first sentencing hearing held on November 21, 2002, a little more than seven months following the verdict in this case, appellant had an emotional outburst while his mother was testifying on his behalf. Following that outburst, in order to maintain control over appellant, he was placed in restraints, pursuant to a recommendation by the Sheriff's Office. The outburst prompted the Psychiatric Social Worker testifying at the sentencing hearing on behalf of appellant, Pamela Taylor, to follow up with him upon his return to the Montgomery County Detention Center. As a result of her conversation with appellant, Taylor learned that appellant has suffered from "hallucinatory voice"—predating the offense for which appellant was convicted. Taylor also learned that appellant has written about his hallucinations in letters sent to Kinzer.

Appellant permitted Taylor to retrieve the letters from Kinzer and, after reviewing the letters, Taylor suggested that appellant be evaluated by Neil Blumberg, M.D.

Dr. Blumberg examined appellant for a total of five hours and fifteen minutes over two days, January 9, 2003 and January 21, 2003. Based upon the examination of appellant, and several documents, including notebooks and diaries created prior to the current conviction, Dr. Blumberg testified at the June 24, 2004 hearing that, "to a reasonable degree of medical certainty [ ] on October 20, 2001, [appellant] was suffering from several different mental disorders, including schizophrenia paranoid type, alcohol dependence, poli[sic] substance abuse, cognitive disorder not otherwise specified, and anti-social personality disorder." Dr. Blumberg also revealed that the first evidence of appellant's hallucinations was contained in a record from Shady Grove Adventist Hospital from February of 1999. Significantly, Dr. Blumberg testified "that at the time of the offense, [appellant], as a result of paranoid schizophrenia and other disorders . . ., lacked substantial capacity both to appreciate the criminal [sic] of his conduct and to conform his conduct to the requirements of law."

On cross-examination, the State pressed Dr. Blumberg in an apparent effort to show that there was evidence that appellant suffered from a mental disorder that was easily discovered prior to the revelation of November 12, 2002. Specifically, the State pointed out that both the record from Shady Grove Adventist Hospital, and a pre-sentence investigation report from 2000, revealed that appellant had mental health issues. Dr. Blumberg, however, testified that appellant "made great efforts to hide evidence of his mental illness . . . made great efforts not to look crazy, which is very consistent with someone who is living in the streets and want[s] to be portrayed as perhaps an antisocial kind of individual as opposed to someone who is mentally ill." .

Dr. Blumberg's report indicated evidence of malingering, or deliberate exaggeration on the part of appellant. When asked about the malingering, Dr. Blumberg said that appellant's exaggeration of the illness was exaggeration of an already

severe illness, rather than appellant simply "making-up" the illness. Dr. Blumberg also revealed that he primarily relied upon appellant's self-reporting of the illness, explaining that a mental illness in which a person hears voices is not capable of external verification. Dr. Blumberg stated, "The thing that really convinced me is the objective data, that is the earlier writings of [appellant] consistent with what he's telling me now, as well as the documentation in the Shady Grove record of his report of hallucinations back in February of '99."

The court also questioned Dr. Blumberg, first on the basis of his opinion that "the shooting, on October 20, 2001, was a result of a command hallucination, directing appellant to kill and, secondly, on the fact that appellant reported the hallucinations only after he was convicted." Dr. Blumberg responded that his opinion that appellant was suffering from command hallucinations on the night of the shooting is largely based upon the truthfulness of appellant in reporting the incident. With respect to the timing of the report, Dr. Blumberg stated, "an initial look at this might lead one to view this as fate, you know, and just a way to get out of his conviction or, . . ., anticipation of a lengthy sentence. However, when you factor in the other evidence that I found, it would suggest that he has suffered from a severe mental illness for a number of years prior to this that in fact he has hidden that from a variety of people . . ."

The court continued to question Dr. Blumberg concerning his assessment that appellant would attempt to conceal his illness and not report the voices. The court and Dr. Blumberg engaged in the following colloquy:

THE COURT:—I thought I heard you testify that he did not disclose these hallucinations prior to the offense and yet, at least as it's been represented to me, that he disclosed these hallucinations prior to the offense to his girlfriend.

Blumberg: Well, he disclosed them to the doctors at Shady Grove Adventist Hospital also. I'm aware that they were in the writings.

\* \* \*

Blumberg: If the girlfriend was the recipient of some of those writings, then she would have been aware of it. I'm not aware of any other—I don't recall off hand whether she was the one who had, had received those and was aware of that or not.

THE COURT: Okay. *So if you assume that he, [appellant], disclosed the hallucinations to the doctors at Shady Grove, disclosed the hallucinations to his girlfriend prior to the offense, and failed to disclose any of the hallucinations or the presence of hallucinations at any time from the time he was charged with this, this crime through the preparation of the defense, through the trial, to the time that he was convicted, that doesn't affect your impact, your assessment of his veracity?*

Blumberg: Well, actually, that would, I guess, improve the likelihood that he is being truthful because he's doing what we could call reverse malingering, if that in facts [sic] is the case. That is hiding the fact that he is severely mentally ill, trying to portray himself as being normal when he in fact he is, he is not.

\* \* \*

THE COURT: And so it would be safe to conclude that he was aware of the hallucinations that he claims to have had occurred on the date of the offense from the time of the offense through the time of conviction?

Blumberg: He's aware of these experiences. He doesn't view them as hallucinations or signs of a mental illness. He is convinced that this, at least initially, this was his spiritual godfather although he has later come to believe that this is a monster inside him that is in many aspects controlling what he thinks and what he experiences.

THE COURT: Given the fact that there was [a] prior report of the existence of hallucinations, at least to the doctors at Shady Grove and from what I've been represented (inaudible) to his girlfriend, do you see any psychiatric condition that would have prevented him from disclosing these hallucinations at any time after the offense?

Blumberg: I don't know that I'd call it a, a psychiatric condition, but it's not uncommon in individuals who suffer from unusual or bizarre symptoms to want to maintain the perception that they're just as normal as everybody else.

Finally, appellant's counsel made a proffer [1] to the court that, although he had exercised due diligence, his efforts had

---

1. The following is the proffer made by counsel to the court in support of his claim that he had acted diligently.

My proffer essentially goes to the issue of due diligence in this case and I think there's, to some extent, been some testimony from Dr. Blumberg in that regard in terms of what I did. And in this particular case, when I was assigned this case by the Office of the Public Defender, I obviously sat down and I reviewed the discovery that the State provided me in this particular matter. And in addition to that, as we all do in the Office of the Public Defender, we talked to other lawyers in the office to find out whether any of those lawyers represented a particular defendant on a previous occasion and we asked whether or not there's anything significant that we ought to know. And, in particular, I spoke to Brian Shepperman (phonetic sp.)—he's available to testify if the court wants—about Mr. Mack and we talked about whether or not he had any mental problems that I should know about or I should explore and during the course of that conversation, Mr. Shepperman said no. He said I was with him many times. I reviewed pre-sentence investigations that had been prepared in his cases and I saw nothing which would lead me to believe that he has any mental problems that you should look at.

In addition to that, as Mr. Shepperman, like me, had an opportunity to handle the case for Mr. Mack, he spoke with Richard Kay (phonetic sp.), who was formerly of our office, who also had represented Mr. Mack, and he asked similar questions to one that I have—
THE COURT: Robert Kay?
MR. DREW: Robert Kay. I'm sorry. That shows how much I know Mr. Kay. Anyway, he talked to Mr. Kay about his representation of Mr. Mack. He asked the same questions that I asked of Mr. Shepperman and, again, Mr. Kay didn't report anything of that nature concerning Mr. Mack. I mean, it was pretty consistent that he wasn't the easiest client to represent, but despite is [sic] not being able to represent no one but no one ever observed any disorders.

I spoke to Dianne Kenser, Mr. Mack's girlfriend, and asked her about him and asked, you know, if there was anything special about, any unusual emotional problems or things that I ought to know about. We, I had talked to her for the purposes of preparing for trial and she didn't report anything. She never told me, nor did I have any reason to believe that she had any of these diaries and unless you have some reason, you won't ask the question.

failed to uncover the evidence concerning appellant's mental health.

At a hearing held on November 18, 2004, the court denied appellant's motion for a new trial based on newly discovered evidence. The court concluded that appellant's counsel had exercised due diligence, in that there was no way to discover that appellant suffered from command hallucinations, evidence exclusively within the mind of appellant, unless appellant disclosed that information. Appellant, however, had not exercised due diligence because he failed to report the hallucinations to his counsel from the date of the offense, through trial, and until after the first sentencing hearing. The court found that appellant was competent to stand trial, he understood the nature of the proceedings as well as the charges against him, and was able to assist his counsel in his own defense. The court stated that, based on Dr. Blumberg's report, it was persuaded that appellant was aware of the hallucinations at all times from the date of the offense until the disclosure, after the first sentencing hearing. Thus, the court determined that the question before it was whether appellant acted reasonably and in good faith, in not disclosing the command hallucinations to his counsel.

> The first time in this particular case that I became aware of any mental disorder was after that hearing in which Mr. Mack had the emotional outburst. After that hearing, because Ms. Taylor was here, she and I went back after the court recessed for the day. We had a long conversation and she said I just don't understand why that happened and would it be okay if I went back to talk to him? And that is the very first time that I learned from her of these hallucinations. And she had spoke to Ms. Kenser as well at that point.
> So I would suggest to the court, most respectfully, that with regard to the due diligence prong of the newly discovered evidence rule that we're talking about—I did everything that I think I could have done to determine was [sic] to whether or not there was any mental disorder in this case and, quite candidly, I'm not aware of one other way that I could have found it out. And, certainly, based on this condition and based on what you've heard from Dr. Blumberg, this wasn't the kind of thing that Mr. Mack was going to tell anybody about because he did not want to be perceived as being crazy and it is consistent with this disorder that he suffers from. So I would suggest to the court that this [sic] the due diligence.

In answering that question, the court concluded that it would be reasonable for appellant to fail to disclose that information if there were a mental or physical condition preventing disclosure. The court found there was no physical or mental condition preventing disclosure. Specifically, the evidence showed that appellant had disclosed his mental condition to Kinzer in his writings and to Taylor following the first sentencing hearing at Shady Grove Hospital. Unable to identify any psychiatric condition preventing appellant from disclosing the condition, Dr. Blumberg was also unable to determine if the illness would prevent appellant from reporting. The court determined that a reasonable person, in appellant's position, facing charges for attempted first-degree murder, having command hallucinations directing him to kill the victim, would have revealed that information.

The court also found that appellant did not act in good faith in not disclosing the information. This finding was based on the report of Dr. Blumberg, which showed evidence of malingering in appellant's psychiatric evaluation. Dr. Blumberg's report stated that appellant deliberately exaggerated his psychiatric condition, and that there were serious questions as to whether he had exaggerated his complaints. The court concluded that appellant deliberately withheld the evidence of the command hallucinations until after the jury returned the verdict. He did so, in the court's view, in an attempt to rely upon this evidence to avoid long-term incarceration. Ultimately, the court ruled:

> There is no question in this case that the proffered newly discovered evidence is material to the result of this case and the materiality threshold has been met. It is not merely cumulative or impeaching. The issue revolves around the exercise of due diligence by the defendant.
>
> * * *
>
> Since the newly discovered evidence was contained exclusively within the mind of the defendant, the court is convinced that the defendant's counsel acted with due diligence and could not have discovered the evidence of command

hallucinations at the time of the offense until the defendant disclosed that evidence. This conclusion, however, does not resolve the issue of due diligence. The question is whether the defendant himself failed to exercise due diligence by not reporting to his attorney the command hallucinations at any time, from the date of the offense, through trial, until after the first sentencing hearing.

Because the court made a factual finding that the newly discovered evidence was material, its ultimate decision devolved upon the question of whether appellant exercised due diligence in failing to disclose the evidence of the command hallucinations within ten days of the jury verdict.

## LEGAL ANALYSIS

■ Appellant assails the court's ruling that he "failed to exercise due diligence by not reporting to his attorney the command hallucinations at any time, from the date of the offense, through trial, until after the first sentencing hearing." He further assails the ruling that the evidence demonstrated that he possessed knowledge that a reasonable person would have known was relevant to his defense. Aggrieved by the court's determination that he was not incompetent or unable to reveal the evidence, appellant, in support of his thesis, points out the distinction between incompetence and mental illness, *i.e.,* that "an accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense, and the fact that the defendant was receiving medication and would require medication during the course of the trial does not render him incompetent."

Citing *State v. DeAngelis,* 200 Conn. 224, 511 A.2d 310, 315 (1962), he then builds on his hypothesis by reiterating the well-established precept that a plea of not criminally responsible has no bearing on an accused's competency to stand trial. Thus, he says, "There is nothing in the competency standard that requires a defendant be capable (either intellectually or

psychologically) of performing a psychiatric self-diagnosis and understand its significance in criminal proceedings."

Due diligence, of course, in most proceedings, is the standard to which we hold attorneys, rather than defendants, in determining whether evidence is truly newly discovered. In the instant case, the newly discovered evidence, in essence, is the defendant's state of mind.

Maryland Rule 4–331, captioned Motions for New Trial, provides in pertinent part:

(a) Within Ten Days of Verdict. On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

(c) Newly Discovered Evidence. The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

(1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later;

It is well settled that a new trial may be granted in a criminal case tried before a jury. *Argyrou v. State*, 349 Md. 587, 599, 709 A.2d 1194 (1998) (citing *In re Petition for a Writ of Prohibition*, 312 Md. 280, 308, 539 A.2d 664 (1988)); *see also Campbell v. State*, 373 Md. 637, 655, 821 A.2d 1 (2003). "To grant or deny a motion for a new trial on the basis that a verdict is against the weight of the evidence is, of course a discretionary matter." *Yorke v. State*, 315 Md. 578, 583, 556 A.2d 230 (1989) (quoting *In re Petition for a Writ of Prohibition*, 312 Md. at 327, 539 A.2d 664). Trial courts are vested with "wide latitude in considering a motion for new trial and may consider a number of factors, including credibility, in deciding it; thus, the court has the authority to weigh the evidence and to consider the credibility of witnesses in deciding a motion for new trial." *Argyrou*, 349 Md. at 599, 709 A.2d 1194 (citing *In re Petition for a Writ of Prohibition*, 312

Md. at 325–26, 539 A.2d 664). A trial judge's discretion, although broad, is not boundless, and abuse of that discretion occurs when it is exercised "in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of law." *Campbell*, 373 Md. at 665–66, 821 A.2d 1 (internal citations omitted). "It may be said that the breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable, it will expand or contract depending upon the nature of the factors being considered, and the extent to which its exercise depends upon the opportunity the trial judge had to feel the pulse of the trial, and to rely on his or her own impressions in determining questions of fairness and justice." *Argyrou*, 349 Md. at 600, 709 A.2d 1194 (citing *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 58–59, 612 A.2d 1294 (1992)). *See also Campbell*, 373 Md. at 666, 821 A.2d 1.

Maryland Rule 4–331 provides the basis for the court's consideration of a defendant's motion for a new trial. Judge Moylan, writing for this Court in *Love v. State*, 95 Md.App. 420, 621 A.2d 910 (1993), explained the proper operation of the Rule. "The Motion is available on three progressively narrower sets of grounds but over the course of three progressively longer time periods." *Id.* Pertinent to our analysis is subsection (c) of the Rule, which provides, "The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule: (1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later." Subsection (a) of the Rule states, "[o]n motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial." Appellant has met the procedural requirements of the Rule, *i.e.*, the alleged new evidence was discovered more than ten days after the jury verdict and he filed a motion within one year of the date the court imposed sentence. Satisfying these preconditions, however, is insufficient to warrant the granting of a new trial.

As the Rule makes clear, and as Judge Moylan explained in *Love*, "the exclusive predicate for new trial relief under subsection (c) is not merely 'newly discovered evidence.' It is, rather, 'newly discovered evidence which could not have been discovered by due diligence.' Even if, for stylistic reasons, we occasionally resort to the convenient shorthand form of 'newly discovered evidence,' it is nonetheless implicit that an indispensable part of the definitional predicate for this form of relief is the further and invariable proviso: 'which could not have been discovered by due diligence.' " 95 Md.App. at 429, 621 A.2d 910.

 Additionally, in order for newly discovered evidence to warrant a new trial, it must be both material and persuasive. *Campbell*, 373 Md. at 666, 821 A.2d 1. For the evidence to be material it must be more than "merely cumulative or impeaching." *Argyrou*, 349 Md. at 601, 709 A.2d 1194 (citing *Jones v. State*, 16 Md.App. 472, 477, 298 A.2d 483 (1973)). Materiality is a threshold question for the court. *Id.* (citing *Stevenson v. State*, 299 Md. 297, 302, 473 A.2d 450 (1984)). Moreover, for the evidence to meet the requirement of persuasiveness, the trial court must determine if "the newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Yorke*, 315 Md. at 588, 556 A.2d 230. In this case, the trial court found "[t]here is no question [ ] that the proffered newly discovered evidence is material to the result of this case and the materiality threshold has been met. It is not merely cumulative or impeaching." The trial court, however, found that the additional evidence did not constitute "newly discovered evidence" because appellant failed to exercise due diligence in reporting the command hallucinations to his counsel.

The Court of Appeals in *Argyrou* explained, "Whether evidence is newly discovered has two aspects, a temporal one, *i.e.*, when was the evidence discovered?, and a predictive one, *i.e.*, when should or could it have been discovered? It is to the latter that the requirement of 'due diligence' has relevance."

349 Md. at 602, 709 A.2d 1194. The Court continued, stating: "Thus, we believe that, as used in Maryland Rule 4–331(c), 'due diligence' contemplates that the defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him or her." *Id.* at 605, 709 A.2d 1194.

Appellant relies on the decision of the United States Court of Appeals for the Eighth Circuit in *U.S. v. Massa,* 804 F.2d 1020 (8th Cir.1986) wherein the Court considered the appellant's motion for new trial based on newly discovered evidence emanating from the following facts:

Massa argues that psychiatric treatment, subsequent to trial, has revealed that he did not knowingly participate in the scheme to defraud Stix, and, therefore, he is entitled to a new trial. This argument is supported by an affidavit of Dr. R. Eugene Holeman which essentially states that because Massa idolized Brimberry, he lapsed into "magical thinking" which prevented him from seeing "the big picture," that is, from knowing that he and Brimberry were engaged in an embezzlement scheme:

The [noncriminal] explanation for his behavior lies in the compulsive part of his personality. One compulsive symptom has been to escape into relationships with men whom he saw as stronger, smarter or wealthier than himself. He idealizes them and allows them to take advantage of him. He sees these individuals as bigger than life, as an answer to his chronic feelings of inadequacy. To maintain this magical view his conscious mind does not see what is obvious to others about this kind of person. . . . In the therapy process we have seen a series of these relationships, beginning in adolescence and continuing into the relationship with Mr. Brimberry. Each had the same compulsive characteristic, but Mr. Massa was unable to see the "big picture". . . . The relationship with Mr. Brimberry was the most extreme of these relationships-following Brimberry's grandiosity, accepting

his lies and distortions and ultimately meeting with his unconscious needs for self-destruction.

*Id.* at 1022.

The United States Court of Appeals rejected the District Court's determination that the affidavit of the psychiatrist did not entitle Massa to a new trial because "the factual circumstances supporting [the psychiatrist's] affidavit was certainly known to both [Massa] and his family well before the trial of this action, and, therefore, the court could not infer diligence on the part of the movant to discover the evidence before trial." The Court of Appeals concluded:

We cannot agree with the court's reasoning on this point. Although the factual details underlying Holeman's affidavit were known to Massa prior to trial, *he did not know that an expert would opine that those details of his life had so affected his mental state as to render him incapable of committing the crimes with which he was charged.* Indeed, Holeman formed this opinion only after counseling Massa for over eighteen months. (Emphasis added.)

*Id.* at 1022.

 The court decided *Massa* on the basis that a jury probably would have acquitted Massa had it been privy to the report of the psychiatrist. We extract from *Massa* the principle that the grant of a new trial for evidence "exclusively within the mind of the defendant" is appropriate only in a case where the only conclusion which the fact-finder is ineluctably compelled to reach is that the accused did not know that the evidence would have exonerated him. Only under such circumstances can it be said that the evidence was not "discoverable."

While, at first blush, the rationale undergirding the court's determination that Massa, afflicted with a compulsive disorder, did not fail to exercise due diligence would seem to be persuasive authority, the case is factually inapposite. Significantly, there was no evidence that Massa intentionally withheld the information concerning his mental state. It took an expert more than eighteen months of counseling to extrapolate

and determine the significance of that information. Here, the court's decision was based on the timing of Mack's revelation that he suffered from the command hallucinations, *i.e.*, whether Mack had intentionally withheld the information until after the guilty verdict was rendered. The court determined that Mack had intentionally withheld the information in an effort to avoid long term incarceration. Dr. Blumberg reported evidence of appellant's malingering. He also testified that the appellant may have exhibited indicia of reverse malingering, in which he tried to hide "the fact that he is severely mentally ill, trying to portray himself as being normal when he in fact . . . is not." There was no discussion, in *Massa*, of attempted deception regarding the appellant's illness; the case turned on Massa's inability to properly assess the probative significance of the illness to his defense.

Moreover, the length of time required to determine the inability to appreciate the significance of defendant's mental state, in *Massa*, demonstrates that Mack's condition was more easily discoverable. Only after eighteen months of counseling was a trained expert able to conclude that Massa was incapable of appreciating the significance of his mental state. It was unlikely that the probative value of Massa's mental state to his defense could have been realized and therefore that it could have been discovered. Afforded the opportunity to evaluate Massa for the purposes of trial or sentencing, it took a trained expert, Holeman, eighteen months to arrive at the opinion that Massa's condition affected his ability to perceive the severity of his mental defect.

By contrast, in just over five hours, Dr. Blumberg was able to diagnose Mack's mental condition and conclude that it affected his ability to resist the dictates of the command hallucinations. It certainly was within the purview of the trial judge to find, from the evidence, that appellant deliberately withheld information regarding his alleged hallucinations. If Mack had not intentionally withheld this evidence, there is little doubt that a timely evaluation would have been undertaken, disclosing this evidence to his defense counsel, the trial

court and the jury. The facts of *Massa* do not support appellant's claim in the instant matter.

Our research has uncovered only a few cases in which the newly discovered evidence was the defendant's mental state. The United States Court of Appeals for the Seventh Circuit in *U.S. v. Allen*, 554 F.2d 398, 403 (10th Cir.1977) reviewed a denial of motion for new trial which had been filed on the basis that movant was unaware of the importance of his condition, described as "schizophrenic potential in a basically obsessive-compulsive character with some defensive decompensation and a pervasive use of denial."

> The trial court denied the motion for a new trial after consideration of the motion and affidavits, but without a hearing, on the ground that "the evidence should have been discovered prior to trial through the exercise of due diligence by Mr. Allen or his attorneys." (R. I, 165). The court's reasons were explained in some detail. The order said that as early as August 1974 four months before trial the competency issue was raised by Allen's attorneys in a *motion for a continuance* which alleged that defendant was in a Minnesota clinic and unable physically or emotionally to attend a hearing. Counsel was requested to submit a report on defendant's condition and was asked if he wanted to arrange for a psychiatric evaluation of Allen. Counsel responded by filing a copy of a letter from Dr. Martin, dated September 6, 1974, stating that he had been treating Allen since April of 1970 and explaining his mental and physical condition. The court concluded that "(e)ven assuming it is in the nature of Allen's illness to conceal its nature and severity, there is no contention that his attorneys or Dr. Martin labored under the same handicap." (R. I, 166–67). The court did not make an express finding or ruling on the alternative ground of ineffective counsel as alleged in defendant's motion.

*Id.* at 403.

In *Government of the Virgin Islands v. Martinez*, 831 F.2d 46 (3rd Cir.1987), the United States Court of Appeals for the

690

Third Circuit denied the appellant's motion for new trial based on allegations that he had confessed to police officers to killing the victim in self-defense, but was prevented by family pressure from communicating truthfully with his attorney concerning the fact that he had killed the victim. The Court distinguished *Martinez* from *Nagell v. U.S.*, 354 F.2d 441 (5th Cir.1966), the decision upon which appellant had relied.

There, the appellant, Nagell, a war veteran, who, on at least three occasions, had been injured in the defense of his country, suffered an organic brain injury as the result of an airplane crash, which claimed the lives of all the other passengers on the flight. *Id.* at 443. It was apparent to the trial court from the outset that Nagell was suffering under some mental disorder, which presented the possibility of an insanity defense for Nagell. *Id.* at 443. Nagell, after suffering the brain injury, was hospitalized at Walter Reed Hospital, returned to duty, retired, married and divorced, and worked for the State of California, a job which he eventually lost. *Id.* at 443. Nagell had, at some point, shot himself in the left side of the chest, a wound he initially claimed was inflicted by an unnamed assailant. *Id.*

Nagell had a well documented history of mental disorders from multiple facilities. *Id.* at 443–44. He refused to cooperate with psychiatrists assigned by the court to evaluate his condition, ultimately ending with a diagnosis that he was competent to stand trial, understood the proceedings against him, and was able to assist his counsel. *Id.* at 444. Three of the five attorneys appointed to defend Nagell were excused, at his request, for various reasons and, although he attempted to release the remaining two attorneys, they remained. *Id.* at 444–45. Nagell claimed throughout that he had never been treated by a psychiatrist, that his military and veterans administration records would prove he suffered no psychosis, and that he would not participate in any psychiatric examination or consultation. *Id.* at 445. During the trial, four psychiatrists testified, all of them concluding that Nagell understood right from wrong and was competent to stand

trial; however, none of the four mentioned the organic brain injury. *Id.* 445–46.

Nagell thereafter revealed to his attorney information concerning his injury, which then resulted in a hearing on a motion for a new trial. *Id.* at 446. The doctor who treated Nagell, while at Walter Reed Hospital, was subpoenaed to testify, revealing the nature of Nagell's injury and its effect on him. *Id.* at 447. Peculiarly, the doctor testified that Nagell's manifestations would confuse a person attempting to evaluate him unless he was privy to information concerning the injury and Nagell's history. *Id.* He also stated that Nagell complicated the matter by denying the illness and attempting to conceal it and that the brain damage did not affect the ordinary components of intelligence. *Id.* While Nagell could understand the nature of the charges against him, he was not able to confer with his attorney's or raise a defense. *Id.*

Thereafter, at least two of the doctors who testified at the trial stated that their diagnosis would be different if they had known of the organic brain injury. *Id.* Another physician testifying at the hearing stated that Nagell suffered from "Anton's disease, which would cause him to deny mental illness and to do anything he could to mislead others with reference to it." *Id.* at 448

The Court ultimately held:

The one which evidently gave the trial court genuine difficulty was the contention of the government, strongly urged there and here, that since appellant all the time knew the crucial facts and concealed them from his counsel then the motion must be denied for lack of diligence. If the concealment had come from a sound mind this undoubtedly would be right. But the proof is really without substantial dispute that appellant was suffering from a mental disorder which caused, if not compelled, him to follow this course. He is thus no more to be bound by it in a serious matter of this kind than in any other situation involving mental derangement

\* \* \*

Every doctor who testified at the trial was of the opinion that Nagell could distinguish between right and wrong on September 20, 1963. As a result of the newly discovered evidence, which the defendant concealed as the result of a damaged brain and a diseased mind, three doctors, one of them an outstanding national authority on brain damage, are now prepared to testify that in their opinions he did not then know the difference between right and wrong. This puts an entirely different face on the matter. Of course, we do not decide the merits of the case, but we believe another jury should have an opportunity to decide the guilt or innocence of this man in the light of this new evidence. New trials are to be granted only with the greatest caution. This is a sound rule. The reasons in support of it are obvious. In directing a new trial in this case we do so on its particular facts. We do not in any way diminish the general rule.

*Id.* at 448–49.

The trial court, in the case at hand, was not persuaded, as in *Nagell*, that the concealment of the purported "newly discovered evidence" was proximately caused by "a damaged brain and a diseased mind." Its denial of appellant's motion for new trial was based on the belief that appellant was malingering. The Court of Appeals, in *Argyrou*, enunciated the yardstick by which we determine the authenticity of a claim of ignorance to the significance of newly discovered evidence:

Thus, it would appear that Benner's credibility was not the decisive factor in the court's denial of the petitioner's new trial motion. Rather, it clearly seems to be that the court distrusted the circumstances surrounding the confession; *it found the timing of it untrustworthy and suspicious.* While the confession may have largely been true, the court was not satisfied that, viewed from the perspective of Rule 4–331(c), it was timely. In short, the court focused not on the credibility of the confession in all of its details; *it was, instead, focused on the trustworthiness of the totality of the circumstances* giving rise to the confession. In so doing, the court did not abuse its discretion. To be sure,

the credibility determinations of the trial court in this case are important. It is obvious that, in reaching its threshold determination, the court believed the witnesses for the state. Indeed, *it was that testimony which, it must be inferred, caused the court to distrust the timing and circumstances of the confession.* The testimony of the Mall security officer permitted the court to conclude that the petitioner knew, and was in cahoots with, Benner and Seekford and, in fact, that it was the petitioner who was supposed to pick them up, as he did.

*Argyrou,* 349 Md. at 606–07, 709 A.2d 1194.

The trial court made its assessment of whether appellant acted reasonably and in good faith based upon the facts produced at the trial and the hearing on the motion for new trial. From the time appellant was charged in this case, throughout the trial, and until the first sentencing hearing, appellant was aware that he suffered from the command hallucinations, but he did not report this information. The testimony of Dr. Blumberg revealed that appellant was afflicted with this disorder from the time he was eight years old.

The undisputed evidence presented at the hearing, in the form of documentary evidence, as well as the testimony of appellant's expert, established that appellant had reported these hallucinations on multiple occasions. The hallucinations had been reported to Shady Grove Hospital in 1999 which, according to appellant's expert, was one of the documents he relied upon in reaching the conclusion that appellant had a long history of hallucinating. Additionally, although there was some dispute as to whether the writings of appellant were sent to Kinzer or whether they are diaries appellant did not share, the writings were in the possession of Kinzer and contained information that appellant suffered from command hallucinations. These were the very same documents that appellant's expert claimed he relied upon in concluding that appellant suffered from the hallucinations long before he shot the victim in this case. Moreover, appellant was able, in spite of his mental condition, to report the hallucinations, as evidenced by the fact that he actually reported them on several occasions

and was later able to report them to both Taylor and Dr. Blumberg after he had been convicted.

Based upon the foregoing evidence, the trial court did not abuse its discretion in deciding that it was unreasonable for appellant to fail to report the hallucinations to his counsel.

In *Jackson v. State*, 164 Md.App. 679, 700, 884 A.2d 694 (2005), we said the test is "whether the evidence was, in fact, discoverable and not whether the appellant or appellant's counsel was at fault for not discovering it." In this case, the evidence was, in fact, discoverable. The trial court determined that there was no mental or physical reason preventing appellant from reporting the hallucinations to his counsel. We agree. Appellant, indeed, could have revealed the command hallucinations to his counsel, and could have done so within ten days of the jury's verdict as the Rule requires.

Moreover, the court questioned the trustworthiness of the additional evidence offered by appellant. As the court stated, in its opinion there was evidence of malingering in appellant's psychiatric evaluation. The court, during the second hearing, pressed Dr. Blumberg, attempting to determine if the timing of appellant's revelations impacted his evaluation of appellant's claims. In *Jackson*, we said "there is a threshold question of the trustworthiness of the newly discovered evidence and of the credibility of its source. It is clear that the judge called upon to decide the motion may assess trustworthiness and credibility for himself, even though the verdict in the case was rendered by a jury." 164 Md.App. at 702, 884 A.2d 694; *see also Argyrou*, 349 Md. at 607–08, 709 A.2d 1194.

The court opined that it was concerned that appellant was attempting to manipulate the situation and avoid long term incarceration. The alleged newly discovered evidence, as the trial court stated, was exclusively in the mind of appellant. The court found appellant intentionally withheld the information concerning his hallucinations until after the trial, and that he did not act in good faith. When viewed in its totality, we can perceive no abuse of discretion on the part of the trial court in denying appellant's motion for new trial because the

additional evidence offered by appellant did not satisfy the threshold requirement under the Rule. Appellant argues that the trial court's decision requires that he be found incompetent to stand trial. He is wrong. The trial court's decision was properly based upon appellant's failure to exercise due diligence, *i.e.*, he did not act reasonably and in good faith and is therefore not entitled to have his case submitted to a different jury.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**